STATE OF NORTH CAROLINA v. HOWARD MACK MILLER

No. 44

(Filed 14 February 1973)

1. **Searches and Seizures § 3— affidavit relating to gambling — warrant to search for intoxicating liquor — invalidity of warrant**

   Although a police officer's affidavit would have been sufficient to support a finding of probable cause for issuing a warrant authorizing the search of a house for gambling equipment, it was insufficient to support a finding of probable cause as contained in the warrant actually issued authorizing a search of the house for intoxicating liquor.

2. **Searches and Seizures § 3— issuance of warrant — probable cause — duty of magistrate — invalidity of warrant**

   By signing without reading a warrant placed before him by an officer, a magistrate served merely as a rubber stamp for the police, and the search warrant issued under such circumstances was a nullity; thus officers, armed with no authority to enter and search under circumstances requiring a search warrant, made an unlawful entry.

3. **Criminal Law § 84; Searches and Seizures § 1— statutory exclusionary rule — applicability in trial for murder of trespassing officer**

   Though G.S. 15-27(a) provides that no evidence obtained or facts discovered by means of an illegal search shall be competent as evidence in any trial, that rule does not require the exclusion of evidence obtained after an illegal entry when that evidence is offered to prove the murder of one of the officers making the entry.

4. **Criminal Law § 84; Searches and Seizures § 1— unlawful search — murder of trespassing officer — admissibility of evidence relevant to murder**

   Where officers unlawfully entered a house to search for gambling paraphernalia and one of the trespassing officers was killed, the gun

633

and all other evidence seized, if relevant and material to the murder charge, was admissible, and it was competent for all eyewitnesses, both for the State and the defendant, whether lawfully or unlawfully present, to testify regarding every relevant fact and circumstance seen or heard bearing upon the shooting of the officer and upon defendant's plea of self-defense.

**5. Criminal Law § 86; Homicide § 15— injuries to defendant by police officers — competency to show bias of officers**

In a prosecution for the murder of a police officer who was shot during a police raid on a gambling house, defendant had a right to cross-examine the officers with respect to beatings and injuries allegedly inflicted by them upon defendant and other occupants of the house following the shooting, as such testimony was competent to show bias of the witnesses.

**6. Criminal Law § 73; Homicide § 15— statements by third parties — competency to show state of mind of witness — hearsay**

In a prosecution for the murder of a police officer who was shot during a police raid on a gambling house, defendant's testimony as to what others had told him concerning robberies of gambling games was competent to prove the reasonableness of his apprehension that a robbery was in progress and that he was about to suffer death or serious bodily injury and such testimony was not excludable as hearsay.

**7. Criminal Law § 146— certiorari from Supreme Court to Court of Appeals — scope of review**

The Supreme Court reviews the decision of the Court of Apeals for errors of law allegedly committed by it and properly brought forward for review; hence, assignments not passed upon by the Court of Appeals are not before the Supreme Court.

ON *certiorari* to the Court of Appeals to review its decision, 16 N.C. App. 1, 190 S.E. 2d 888 (1972). This case was docketed and argued in the Supreme Court at the Fall Term 1972 as No. 90.

Defendant was tried upon a bill of indictment, proper in form, charging him with the first degree murder of R. E. McGraw on 17 October 1970.

The State's evidence tends to show that Sergeant B. S. Treadaway of the Charlotte Police Department received information from a confidential informant about 10 p.m. on 16 October 1970 that a gambling game was in progress at 1322 East Fourth Street in Charlotte. This officer and others went to that address between 11 p.m. and midnight, obtained the license numbers of cars parked there, and by checking those numbers identified the owners of some of the cars as known gamblers. Sergeant Treadaway related this information to Officer R. E. McGraw.

State v. Miller

Acting on the information received, Officer McGraw typed an affidavit and a search warrant. The affidavit recited, among other things, that affiant had "reliable information and reasonable cause to believe that Occupants [of the premises at 1322 East Fourth Street] has [sic] on the premises and under their control cards, money, dice and gambling paraphernalia," set out the grounds for affiant's belief, and detailed the underlying circumstances upon which the affiant's belief was based. The affidavit was in all respects sufficient to support a finding of probable cause for issuing a warrant authorizing a search of the premises for gambling equipment and paraphernalia. However, the search warrant which Officer McGraw typed was prepared on a "form-type blank" labeled "Search Warrant—Intoxicating Liquor Possessed for Purpose of Sale." This warrant recited that affiant had "stated under oath that Occupants has [sic] in his possession intoxicating liquor for the purpose of sale, described in the attached affidavit," and directed the officers to search the premises "for the property in question" and "if this intoxicating liquor is found, seize it and all other intoxicating liquor found by you to be possessed there in violation of law, plus all glasses, bottles, jugs, pumps, bars, or other equipment used in the business of selling or manufacturing intoxicating liquor. . . . "

Officer McGraw delivered the affidivit and search warrant to Sergeant Treadaway who carried them to the office of J. P. Eatman, Jr., a magistrate, and requested that the search warrant be issued based on the affidavit. Sergeant Treadaway swore to the affidavit before the magistrate but did not read the warrant. The magistrate read the affidavit and "scanned over the search warrant to see if all the blanks were filled," but "did not read completely the search warrant itself." The magistrate signed the warrant within two or three minutes after Sergeant Treadaway had arrived.

Sergeant Treadaway left the magistrate's office, took the affidavit and warrant out to the car and delivered them to Officer McGraw. This occurred about 1:40 a.m. on 17 October 1970.

About ten minutes later, Sergeant Treadaway and thirteen or fourteen officers from the Charlotte Police Department and the Mecklenburg County ABC Board, all of whom were in plain clothes, went to the house at 1322 East Fourth Street. Upon arrival, Sergeant Treadaway, Officer McGraw and six other

officers went to the rear of the house, while the other officers went to the front and side. The back door was standing open, and the officers entered without knocking. They proceeded along the hallway to a second door which had a one-way glass in the top half. This door was unlocked and standing ajar. Sergeant Treadaway opened this second door so that he and the other officers could pass through. They then proceeded down the hallway to a third door, which was closed. This door also had a one-way glass in it, permitting those inside to see out. The officers had proceeded to this point along the thirteen-foot length of the hallway in a crouched position so as to avoid detection. On arrival at the third door, Sergeant Treadaway stood up and knocked lightly, and a man named McGowan, whom Sergeant Treadaway had previously arrested for gambling, opened the door. The door opened outward, and Sergeant Treadaway pulled it completely open enabling him to see into the room. At that time Officers McGraw, Taylor, Tanner, Smith and Patterson were present with Treadaway at the third door while other officers were in the hallway between the first and second doors.

Sergeant Treadaway saw two tables in the room. Seven or eight men were seated at the first table holding cards in their hands and with money on the table. Six or seven men were around the second table. Sergeant Treadaway walked into the room followed by the other officers and announced, "Police, police. Sit down." He walked past the first table at a rapid pace and had almost reached the second table when he heard a shot. A total of four, five or six shots were fired in two short bursts —first two or three shots, then a pause, then some more shots, all within two or three seconds. Sergeant Treadaway turned and saw Officer McGraw on the floor on his knees near the door through which he had just entered. Defendant was standing eight to ten feet away in the doorway to a bathroom holding a blue steel snub-nosed revolver in his right hand and pointing it toward the ceiling. Defendant then entered the bathroom. After the shooting, a blue .38 revolver similar to the one seen in defendant's hand was found in the bathroom. This revolver had five spent shells.

According to the State's evidence, Officer McGraw had followed Treadaway into the room and Officer Tanner had entered immediately behind McGraw. McGraw and Tanner had turned to the right toward the first table. Tanner was

State v. Miller

hit by three bullets but recovered from his wounds. McGraw also received three bullet wounds, two in his back and one in his right forearm. He died as a result of the wound in his back. Officer Taylor followed McGraw and Tanner into the room and testified that he saw defendant fire at McGraw three times, the last shot after McGraw had fallen to the floor. On hearing the first shot, Taylor started to draw his own .38 Smith and Wesson from the holster on his right hip. In addition to Taylor, five other officers testified they were armed with .38 caliber pistols at the time.

An SBI expert in firearms made tests and was of the opinion that a bullet found in McGraw's clothing when he was being undressed in the emergency room at the hospital had been fired from the blue .38 revolver which Sergeant Treadaway had found in the bathroom immediately after the shooting. This expert further testified that a bullet removed from the shoulder of Officer Tanner and a bullet found in the floor had been fired from this same .38 caliber revolver, while a fourth bullet found in the floor inside the door had been fired by Officer Smith's gun. This expert witness had no further opinion as to which gun had fired a bullet removed from under McGraw's right arm or a bullet found in the east wall of the room. Sergeant Treadaway testified that his own weapon was still in its holster after the shooting; that he had not drawn it, and that to his knowledge no other officer had drawn his gun.

Defendant's evidence tends to show that one Scruggs had rented the house for gambling purposes and employed defendant to look after the place, serve food, coffee, beer and sometimes whiskey. Just prior to the officers' entrance defendant had mopped the floor around one of the tables, returned the mop to the bathroom, and heard a noise "like somebody kicking the door down." Defendant saw a man enter the room, knock McGowan to the floor and point a pistol toward the men playing cards at the second table. Two other men entered the room, one with a pistol. The word "police" was never mentioned prior to the shooting. Defendant did not know these men and when one of them told the poker players at the round table to "keep your seat, put your hands over your head, leave the money on the table," defendant thought it was a robbery, pulled his pistol and said, "Hold it." The first man who entered the room (later learned to be Sergeant Treadaway) turned his pistol toward defendant and defendant heard a shot. He ducked into the

bathroom doorway and came up shooting. He fired because he was being shot at and thought they were being robbed. Defendant then turned, reentered the bathroom and for the first time heard the words: "This is the police. Come out of the bathroom with your hands over your head." Defendant dropped his gun and came out with his hands up.

The man named McGowan testified that he was preparing to leave before the officers arrived. He looked through the one-way glass in the door and saw no one. He heard no knock or bell. He turned the doorknob and it was snatched out of his hand. Several men then rushed in carrying guns. The word "police" was not mentioned before the shooting started. A search warrant was not mentioned. Other occupants of the room testified to the same effect.

Defendant was convicted of murder in the second degree and, from judgment imposing a prison sentence, appealed to the Court of Appeals. That court awarded a new trial for the reasons set out in its decision, 16 N. C. App. 1. On petition by the State alleging errors of law, we allowed certiorari to review the decision of the Court of Appeals. Errors assigned will be noted in the opinion.

*Robert Morgan, Attorney General, by Walter E. Ricks III, Associate Attorney, for the State of North Carolina, appellant.*

*James E. Walker and Arnold M. Stone, Attorneys for defendant appellee.*

*John M. Rich, Attorney for North Carolina Association of Law Enforcement Legal Advisors, Amicus Curiae.*

HUSKINS, Justice.

[1, 2]    Defendant contended in the trial court and in the Court of Appeals, and contends here, that the search warrant was invalid and the entry by the officers unlawful. The Court of Appeals so held and we concur.

The Fourth Amendment to the Federal Constitution prohibits the issuance of a search warrant except upon a finding of probable cause for the search. G.S. 15-25(a) is to like effect. There is no variance between Fourth Amendment requirements and the law of this State in regard to search warrants. *State v. Vestal*, 278 N.C. 561, 180 S.E. 2d 755 (1971).

State v. Miller

G.S. 15-26 requires a search warrant to describe with reasonable certainty the premises to be searched and the contraband for which the search is to be made; and an affidavit signed under oath or affirmation by the affiant *indicating the basis for the finding of probable cause* must be a part of or attached to the warrant.

The search warrant in this case was wholly invalid because it was issued without any showing of the existence of probable cause. It authorized the officers to search for and seize "intoxicating liquor possessed for the purpose of sale," plus glasses, bottles and other equipment used in the business of selling liquor, while the affidavit upon which the warrant was issued alleged that the occupants had "cards, money, dice and gambling paraphernalia" on the premises to be searched. The affidavit was amply sufficient to support a finding of probable cause for issuance of a warrant authorizing a search of the premises for gambling equipment, but there was absolutely no fact or circumstance presented to the magistrate upon which he could have found probable cause to issue a warrant to search for illicit liquor. "Under the Fourth Amendment, an officer may not properly issue a warrant to search . . . unless he can find probable cause therefor *from facts or circumstances presented to him under oath or affirmation.*" (Emphasis added) *Nathanson v. United States,* 290 U.S. 41, 78 L.Ed. 159, 54 S.Ct. 11 (1933). Here, the officer who typed the warrant made the first mistake and the magistrate, serving merely as a rubber stamp for the police, compounded the error by issuing the warrant without reading it. As a result the search warrant was issued when no facts or circumstances were presented to justify it. A search warrant issued under such circumstances is a nullity.

Thus the officers, armed with no authority to enter and search under circumstances requiring a search warrant, made an unlawful entry.

[3] Defendant moved to suppress any evidence which the officers obtained after entering the building, including testimony by the officers concerning what they saw and heard in the room at the time Officer McGraw was shot. Defendant contends that since the search warrant is invalid and the entry by the officers unlawful, all evidence obtained by such an illegal search is inadmissible by Fourth Amendment standards and is expressly excluded *in any trial* by G.S. 15-27 (a).

The Court of Appeals held that defendant's motion to suppress the testimony of the officers should have been allowed. In this there was error.

The admissibility of evidence under common law rules was not affected by the means, lawful or otherwise, used in obtaining it, *Olmstead v. United States*, 277 U.S. 438, 72 L.Ed. 944, 48 S.Ct. 564 (1928) ; *State v. McGee*, 214 N.C. 184, 198 S.E. 616 (1938) ; and if the evidence was otherwise relevant and competent it was generally admissible unless its admission violated the constitutional rights of the person against whom it was offered or contravened the statutory law of the jurisdiction. 29 Am. Jur. 2d, Evidence, § 408. In abrogation of the common law rule, the Supreme Court of the United States fashioned an exclusionary rule applicable in the federal courts whereby evidence obtained in violation of the constitutional rights of the accused was not admissible. *Weeks v. United States*, 232 U.S. 383, 58 L.Ed. 652, 34 S.Ct. 341 (1914). Later, in *Mapp v. Ohio*, 367 U.S. 643, 6 L.Ed. 2d 1081, 81 S.Ct. 1684 (1961), it was held that "all evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court." Since *Mapp*, evidence unconstitutionally obtained is excluded in state courts as an essential of due process under the Fourteenth Amendment. *State v. Colson*, 274 N.C. 295, 163 S.E. 2d 376 (1968).

Our statute is to like effect. G.S. 15-27(a) provides: "No evidence obtained or facts discovered by means of an illegal search shall be competent as evidence *in any trial*." (Emphasis added) Relying on the emphasized words the Court of Appeals erroneously extended this statute beyond its intended scope by excluding, in this murder trial, any and all evidence obtained by the officers after entering the building, including their testimony concerning what they saw and heard at the time Officer McGraw was shot.

"In the interpretation of statutes, the legislative will is the all important or controlling factor. Indeed, it is frequently stated in effect that the intention of the legislature constitutes the law. The legislative intent has been designated the vital part, heart, soul, and essence of the law, and the guiding star in the interpretation thereof." 50 Am. Jur., Statutes, § 223. In seeking the legislative intent a construction which will operate to defeat or impair the object of the statute should be avoided if the court can reasonably do so without violence to the legislative language.

State v. Miller

*Lockwood v. McCaskill,* 261 N.C. 754, 136 S.E. 2d 67 (1964). And, where possible, " . . . the language of a statute will be interpreted so as to avoid an absurd consequence." *Hobbs v. Moore County,* 267 N.C. 665, 149 S.E. 2d 1 (1966). Furthermore, "[i]f a strict literal interpretation of a statute contravenes the manifest purpose of the legislature, the reason and purpose of the law should control and the strict letter thereof should be disregarded." *State v. Spencer,* 276 N.C. 535, 173 S.E. 2d 765 (1970). *Accord, Duncan v. Carpenter,* 233 N.C. 422, 64 S.E. 2d 410 (1951) ; *State v. Barksdale,* 181 N.C. 621, 107 S.E. 505 (1921).

When subjected to these rules of statutory construction, we hold that G.S. 15-27(a) was not designed to exclude evidence of crimes directed against the person of trespassing officers. *Compare People v. Pearson,* 150 Cal. App. 2d 811, 311 P. 2d 142 (1957). Application of the exclusionary rule in such fashion would in effect give the victims of illegal searches a license to assault and murder the officers involved—a result manifestly unacceptable and not intended by the Legislature. Although wrongfully on the premises, officers do not thereby become unprotected legal targets. Even trespassers may not be shot with impunity. Such a strict literal interpretation of the language of G.S. 15-27(a) would contravene the manifest purpose of the Legislature and lead to an absurd result.

Admittedly, the constitutional exclusionary rule has been broadly formulated. In *Mapp v. Ohio, supra,* the Court said: "We hold that *all* evidence obtained by searches and seizures in violation of the Constitution is . . . inadmissible in a state court." (Emphasis added.) Again, in *Alderman v. United States,* 394 U.S. 165, 22 L.Ed. 2d 176, 89 S.Ct. 961 (1969), it is said: "The exclusionary rule . . . excludes from a criminal trial *any* evidence seized from the defendant in violation of his Fourth Amendment rights." (Emphasis added.) Even so, the meaning of these expressions must be discerned in light of the facts in each case. When so considered, it is apparent that the rule does not require the exclusion of evidence obtained after an illegal entry when that evidence is offered to prove the murder of one of the officers making the entry.

[4]    Therefore, the gun and all other evidence seized, if relevant and material to the *murder charge,* was admissible; and it was competent for all eyewitnesses, both for the State and the defendant, whether lawfully or unlawfully present, to tes-

---

State v. Miller

---

tify regarding every relevant fact and circumstance seen or heard bearing upon the shooting of Officer McGraw and upon defendant's plea of self-defense. Defendant's motion to suppress such evidence was properly overruled. The Court of Appeals erred in holding to the contrary.

[5] The Court of Appeals held, and properly so, that defendant had a right to cross-examine the officers with respect to beatings and injuries allegedly inflicted by them upon defendant and other occupants of the gambling quarters following the shooting. The law is well established that in both civil and criminal cases a party may cross-examine an opposing witness concerning any fact having a logical tendency to show that the witness is biased against him or has an interest adverse to him in the outcome of the litigation. "Cross-examination of an opposing witness for the purpose of showing his bias or interest is a substantial legal right, which the trial judge can neither abrogate nor abridge to the prejudice of the cross-examining party." *State v. Hart,* 239 N.C. 709, 80 S.E. 2d 901 (1954). *Accord, State v. Bailey,* 278 N.C. 80, 178 S.E. 2d 809 (1971) ; *State v. Wilson,* 269 N.C. 297, 152 S.E. 2d 223 (1967).

[6] The Court of Appeals held, and properly so, that defendant should have been permitted to testify with reference to what others had told him concerning recent robberies of gambling games in the Charlotte area. Hearsay is defined, and the hearsay rule has been stated, as follows: "Evidence, oral or written, is called hearsay when its probative force depends in whole or in part upon the competency and credibility of some person other than the witness by whom it is sought to produce it." *King v. Bynum,* 137 N.C. 491, 49 S.E. 955 (1905) ; *Chandler v. Jones,* 173 N.C. 427, 92 S.E. 145 (1917). "Expressed differently, whenever the assertion of any person, other than that of the witness himself in his present testimony, is offered to prove the truth of the matter asserted, the evidence so offered is hearsay. If offered for any other purpose, it is not hearsay." Stansbury, N. C. Evidence, § 138 (2d ed. 1963).

Here, defendant offered evidence of what others had told him concerning robberies of gambling games to prove the reasonableness of his apprehension that a robbery was in progress and that he was about to suffer death or serious bodily injury. It was competent for that purpose. This evidence was not offered to prove that other robberies had in fact occurred, thus proving the truth of the matters asserted. Accordingly, the

---

Rose v. Materials Co.

---

evidence was not hearsay at all and should have been admitted since it was relevant to defendant's state of mind in relation to his plea of self-defense. *Compare State v. Black,* 230 N.C. 448, 53 S.E. 2d 443 (1949); Stansbury, N. C. Evidence, § 141 (2d ed. 1963).

[7] Defendant made other assignments of error which we do not reach since they were not discussed by the Court of Appeals. The Supreme Court reviews the decision of the Court of Appeals for errors of law allegedly committed by it and properly brought forward for review. Hence, assignments not passed upon by the Court of Appeals are not before us. "When this Court, after a decision of a cause by the Court of Appeals and pursuant to the petition of a party thereto as authorized by G.S. 7A-31, grants certiorari to review the decision of the Court of Appeals, only the decision of that Court is before us for review. We inquire into proceedings in the trial court solely to determine the correctness of the decision of the Court of Appeals. Our inquiry is restricted to rulings of the Court of Appeals which are assigned as error in the petition for certiorari and which are preserved by arguments or the citation of authorities with reference thereto in the brief filed by the petitioner in this Court, except in those instances in which we elect to exercise our general power of supervision of courts inferior to this Court." *State v. Williams,* 274 N.C. 328, 163 S.E. 2d 353 (1968); *State v. Parrish,* 275 N.C. 69, 165 S.E. 2d 230 (1969).

For the errors noted, the decision of the Court of Appeals awarding defendant a new trial is modified to conform to this opinion, and, as thus modified, affirmed.

Modified and affirmed.