**CITY OF ST. LOUIS PARK, State of Minnesota, Petitioner, Appellant,**

v.

**Randall Don BERG, Respondent.**

**No. C3–88–236.**

Supreme Court of Minnesota.

Dec. 9, 1988.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, and Peter A. Cahill, Asst. St. Louis Park City Atty., Minneapolis, for appellant.

William R. Kennedy, Hennepin County Public Defender, Warren R. Sagstuen, Asst. Public Defender, Minneapolis, for respondent.

## OPINION

SIMONETT, Justice.

Defendant was charged with one gross misdemeanor count of obstruction of legal process and two counts of misdemeanor assault for resisting and assaulting two police officers when they tried to arrest him. Following an omnibus hearing, the trial court suppressed all testimony of the police officers describing what happened during the arrest and dismissed the charges. The court of appeals affirmed in an unpublished opinion. We reverse and remand for trial.

Defendant Randall Don Berg, a young man in his twenties, was on probation for

attempted robbery. Because he had failed to maintain contact with his probation officer, a warrant was issued for his arrest. On the afternoon of August 21, 1986, Deputy Steven Anderson tried to serve the warrant on defendant at his parents' home, where defendant was living. Believing that defendant was inside the house, the deputy, accompanied by Officer John Luse of the St. Louis Park Police Department, obtained permission from defendant's father to enter the house and search for defendant. When the officers got to one of the bedrooms, the father withdrew his consent and the officers left.

That evening Deputy Anderson tried again. Conducting a surveillance of the Berg premises, he saw defendant and his father outside the house and, he says, overheard them joking about how they had fooled the dumb officers. Not wanting to attempt the arrest himself, Anderson called Officer Luse, who came to the scene accompanied by two other St. Louis Park officers. Shortly after 10 p.m., Anderson and Luse approached the front door of the house, after having sent the other two officers to cover the back door. Through a window, Anderson could see defendant sitting at the kitchen table. Deputy Anderson knocked on the front door. When Dan Berg, the father, opened the door, Anderson introduced himself and Luse (who was in uniform) as police officers and showed Mr. Berg the warrant. While this was occurring, virtually simultaneously, defendant ran from the kitchen toward a rear bedroom; the two officers at the back door broke in, splintering the locked door from its frame; and Anderson and Luse ran past Mr. Berg, following the defendant to the bedroom.

Anderson and Luse, who claim to have been assaulted, testified at the omnibus hearing, but Muckelberg and Haugen, the two back-up officers, did not. Defendant did not testify but his parents and 14–year-old sister did. What happened inside the house after the four officers had entered is in sharp dispute. The omnibus court chose to believe the version of events offered by defendant's parents and to discredit the version given by officers Anderson and Luse.

Thus the omnibus court found the following facts to be true. Mr. and Mrs. Berg followed the police officers to the bedroom, where they saw the two back-up officers on top of the bed and their son Randy under the bed. The bed's frame had been broken, and the mattress and frame, with the officers on top, had collapsed on Randy. One of the back-up officers was hitting Randy repeatedly on the head with a flashlight or nightstick. Mr. and Mrs. Berg begged the officers to stop hitting their son and were ordered to leave the room. Eventually, Randy was subdued and handcuffed and only then stood upright for the first time. Mr. and Mrs. Berg were never told the arrest warrant was for a probation violation; they thought Randy was being charged with another robbery. Later, a sizeable bloodstain was found on the wall by the bed, just above floor level, the result of Randy's beating.

Officers Anderson and Luse testified, however, to a different version of what had happened. Anderson said he and Luse went into the bedroom and found Randy hiding under the bed, but with his feet protruding. Anderson asked Randy to come out, but he refused. Anderson then grabbed Randy's feet and, with Luse's help, pulled him out from under the bed. When Randy cleared the bed, he did a "sit-up" and socked Anderson in the face, cutting Anderson's face. Anderson let go of Randy's feet to protect himself. In the struggle that followed, Anderson's glasses were knocked off, Randy poked his fingers in Anderson's eyes, and Randy tried to grab Anderson's pistol from its holster. Luse testified Randy kicked and hit him. "We were all on different portions of our bodies at different times," said Officer Luse, adding, "It was quite a tumultuous scenario." According to Luse, Officer Muckelberg tried to help but because the struggle was occurring in a corner of a small bedroom, "it was difficult for anyone else to navigate." Luse thought Officer Haugen was trying to restrain Randy's parents. The omnibus court discounted most of the officers' testimony finding it

"particularly unsatisfactory" and, in some respects, "patently unbelieveable."

The omnibus court determined that Anderson and Luse had made a proper entry at the front door but that the forcible, no-knock entry through the back door by the two back-up officers was in violation of Minn.Stat. § 629.33 (1986). Further, the trial court determined that there were no exigent circumstances justifying the back door entry, and, still further, that excessive force had been used in subduing the defendant. The trial court concluded that the actions of the police were illegal and unconstitutional in two respects, namely, "forceable entry and gratuitous violence used against the defendant," and that, consequently, the testimony of the police describing the defendant's resistance would be suppressed. Recognizing that without this evidence the city had no case, the trial court dismissed the charges.

Two issues are presented: (1) Was the arrest in violation of defendant's constitutional rights? and (2) if so, must the state's evidence of the arrest be excluded at the trial for resisting arrest and assault?

At a pretrial suppression hearing, the issue is "whether the receipt of the evidence contested will vitiate defendant's constitutional rights" and should be suppressed. *State ex rel. Rasmussen v. Tahash,* 272 Minn. 539, 554, 141 N.W.2d 3, 13 (1965); *State v. Kvam,* 336 N.W.2d 525, 528 (Minn.1983). If the evidence is in dispute, the trial court makes findings of fact, reviewable on appeal under the clearly erroneous standard. *Berge v. Commissioner of Public Safety,* 374 N.W.2d 730, 732 (Minn.1985). The legality of the arrest, whether based on facts not in dispute or on facts as found, is a legal conclusion or determination, which we will review like any question of law. *Id.; see also State v. Storvick,* 428 N.W.2d 55, 58 n. 1 (Minn. 1988). Whether an arrest, if illegal, requires suppression of certain evidence is also to be reviewed as a question of law.

■ Here the trial court concluded that the entry through the back door was unlawful and in violation of defendant's Fourth Amendment rights. This determination is not error. Indeed, it is undisputed that the two back-up officers made a forcible, unannounced entry through the back door. Nor can we say that the court erred in determining that no exigent circumstances existed to justify the entry. *Compare State v. Storvick, supra* (where exigent circumstances were found). It was obvious defendant was not going to escape from the house. There was no problem, as in some cases, that the defendant might destroy evidence if not quickly apprehended, nor, on this record, can it be said there was any concern that defendant might be going for a weapon.

In addition to the entry into the house, the trial court also determined that the seizure of defendant's person was unlawful. The trial court concluded that the officers' resort to violence in seizing defendant was unreasonable and, therefore, unconstitutional. While the state strongly objects to the trial court's factual underpinnings for its legal determination, we need not decide if those findings are clearly erroneous.

■ Considering both the entry and the forcible seizure as Fourth Amendment violations, does the poisonous fruit doctrine require exclusion of evidence of defendant's resistance to the unlawful arrest? "The connection between the force and violence unconstitutionally used in Mr. Berg's arrest and the statements of the police," said the trial court, "are such as to make them inextricable." Consequently, citing *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), the trial court ruled that the "poisonous fruit"—the arresting officers' testimony of defendant's conduct—must be suppressed. We disagree.

This court has rejected the contention that evidence of a defendant's resistance to an illegal arrest must be suppressed as forbidden fruit of a Fourth Amendment violation by the police. *See, e.g., State v. Kittleson,* 305 N.W.2d 787, 789 (Minn.1981) ("contrary to defendant's argument, the exclusionary rule did not require suppression of the evidence of this assault on the officer even if the entry was in violation of

*Payton* [445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639] "); *State v. Bale,* 267 N.W.2d 730, 732–33 (Minn.1978) (even if defendant's violent response to arrest would not have occurred "but for" the illegal arrest, the evidence of the violent response would not be suppressed); *see also State v. Combs,* 394 N.W.2d 567, 569 (Minn.App. 1986) ("It is well settled that even when police conduct an illegal arrest or search, evidence of a crime committed in response is not suppressed as a fruit of the prior illegality."), reversed on other grounds but on this point approved in *State v. Combs,* 398 N.W.2d 563, 565 n. 2 (Minn.1987). The deterrence of unlawful police conduct, which is the basis for the exclusionary rule, must yield to countervailing concerns. To exclude evidence of a defendant's assaultive response to a Fourth Amendment violation would be a license for defendants to assault police officers, even to murder them. *See State v. Miller,* 282 N.C. 633, 194 S.E.2d 353 (1973); also 4 W. LaFave, *Search and Seizure* § 11.4(j) (2d ed. 1987).

In *State v. Bale, supra,* we said that whether the illegality required suppression depended on whether the evidence sought to be suppressed arises from an "exploitation of that illegality." *Id.,* 267 N.W.2d at 732. In *Bale,* the defendant pulled a gun on the police officer who had made an illegal arrest (a traffic misdemeanor arrest for an offense that had not been committed in the officer's presence). While we noted that defendant's assault was "an intervening act of defendant's free will," we also said, "More important is the fact that no intent to secure evidence motivated the decision to custodially arrest defendant on the misdemeanor charge." *Id.* at 733. We agree with LaFave that the real basis for not extending the exclusionary rule in situations of this kind is not a "causation" rationale, not a question of whether the defendant's resistance and the police officers' unlawful conduct are inextricably interwoven, but whether the state is seeking to exploit the illegality of its agents to gain some advantage. LaFave, *supra.* Here, there is no exploitation. The police officers' arrest of defendant Randy Berg was simply to arrest him for a probation viola-

tion, nothing more. The arrest did not lead to seizure of other evidence relating to the offense for which arrested or for some other offense. Nor is it suggested that the officers were deliberately provoking defendant into committing a new crime of resisting arrest. We hold, therefore, that evidence of defendant's resistance to arrest may not be excluded as poisonous fruit of a Fourth Amendment violation.

Consider by way of contrast *People v. Cantor,* 36 N.Y.2d 106, 365 N.Y.S.2d 509, 324 N.E.2d 872 (1975). There defendant pulled a gun when illegally arrested, but instead of being charged with resisting arrest (as in *Bale*), defendant was charged with two different offenses and subsequently convicted of unlawful possession of a weapon. On appeal from the conviction, the New York Court of Appeals held that evidence of the gun should have been suppressed as poisonous fruit of an unconstitutional seizure; thus the state could not use its ill-gotten evidence to convict for a crime whose elements did not depend on the events of the illegal arrest itself. The factual dynamics are somewhat different, however, when the crime charged is resisting the arrest, where each side is claiming it was reasonably responding to unreasonable force by the other. To suppress evidence of what the defendant did to the police officers necessarily suppresses evidence of why the police officers acted as they did towards the defendant. In effect, the omnibus court is deciding more than an evidentiary suppression issue; it is weighing the overall evidence for guilt or innocence on the crime charged. If the reciprocating violence of the parties escalates, this weighing process becomes increasingly complicated. If a defendant grabs for the officer's pistol to use it on the officer (as the state claims in this case), and the officer fights back, does the officer's initial use of unreasonable force then become reasonable? And what if the defendant successfully grabs the gun and shoots the officer? Or does a determination that the officer initially used unreasonable force mean that anything that occurs subsequently is suppressed? The very inextrica-

bility of the issues, it seems to us, makes use of the poisonous fruit doctrine inapposite, particularly when its effect is to give the defendant license to resist, no matter how violently, with impunity. Other courts have come to the same conclusion. Thus LaFave writes, "In cases where the response has been a physical attack upon the officer making the illegal arrest or search, courts have again held that the evidence of *this* new crime is admissible." LaFave, *supra*, § 11.4(j), at 460 (emphasis added).[1]

■ A defendant may, of course, offer evidence that his forceful response to the illegal arrest was in self-defense. This court has, however, rejected the argument that defendant has an additional constitutional right to resist an illegal arrest, a right separate and distinct from a claim of self-defense. In *State v. Wick*, 331 N.W.2d 769, 771 (Minn.1983), we said:

> Minnesota law does not recognize defendant's asserted right to resist an unlawful arrest or search. [Cases cited.] Thus, while a defendant would have a right to resist an officer in order to defend himself or another against unjustified bodily attack, assaultive conduct is not justifiable solely on the ground that the officers are violating the defendant's fourth amendment rights or on the ground that the defendant believes that the officers are violating his rights.

*See also State v. Kutchara*, 350 N.W.2d 924, 927 (Minn.1984); *Matter of Welfare of Burns*, 284 N.W.2d 359, 360 (Minn.1979); and *State v. Hoagland*, 270 N.W.2d 778, 780 (Minn.1978). The legality of an arrest is to be decided in a courtroom. *See Hoag-*

*lund, supra* ("A darkened field in rural Itasca County does not appear to be the proper site to present such legal arguments.").

Perhaps there may be a rare instance where the force used by police in making an arrest is so outrageous, so gratuitously violent, that even aside from any criminal or civil remedies that might be taken against the offending officer, due process should bar the government from obtaining a conviction for the defendant's resistance. *See Roberts v. State*, 711 P.2d 1131, 1135 (Wyo.1985); 1 W. LaFave, *Search and Seizure* § 1.13(b), at 293 (2d ed. 1987). That is not the situation here, however, and we should not consider what we do not have to.

Moreover, we need not decide in this case if the trial court's determination of unreasonable force in seizure of the defendant has a sustainable factual basis. Assuming the facts are as found by the trial court, we hold that the unlawful entry and seizure does not require suppression of the officers' testimony. As the omnibus court noted, the state had probable cause to charge defendant with resisting arrest and assaulting two officers. There is no evidence that the officers tried to provoke defendant into attacking them so that they could charge him with resisting arrest, nor has the omnibus court made any such finding. There is no evidence of exploitation. The evidence of what happened in the house, and particularly in the bedroom, is in sharp dispute. It is also incomplete.[2] To suppress the officers' testimony at this juncture would be to decide on conflicting evidence that

1. Defendant quotes 2 W. LaFave, *Search and Seizure* § 5.1(d) at 413 (2d ed. 1987), where the author poses the question: "If a Fourth Amendment violation of this excessive force type occurs, must evidence obtained incident to an arrest brought about by the excessive use of force be suppressed?" and notes that the author answers the question "yes." Defendant lifts this statement out of context and also misquotes it. (In his brief, defendant refers to *"the* excessive force type," while the correct quote is *"this* excessive force type.") In referring to "this excessive force type," Professor LaFave is discussing the quite different situation where an officer uses deadly force to prevent the escape of a felon.

2. Perhaps because this was the omnibus hearing, only the two officers, who filed charges for being assaulted, testified. The two back-up officers did not testify and the omnibus court found this significant. The omnibus court stated that "the officers who did testify spoke as though the others were barely involved," although the record also reflects that Anderson and Luse were preoccupied with their own encounter with the defendant. We make these comments only to indicate the omnibus record leaves many questions unanswered. A final observation: If the officer had in the beginning explained that the defendant was only wanted for a probation violation, one wonders if events would have gotten out of hand as they did.

defendant's resistance was judicially licensed or constitutionally justified (claims we do not recognize). Neither can it be said that the evidence was such that no reasonable trier of fact could credit the state's version of events so that this case, at this stage, can be dismissed as a matter of law. *Cf. State v. Housley,* 322 N.W.2d 746 (Minn.1982) (jury verdict of assault on police officer reversed outright on appeal).

At the trial on the charges of resisting arrest and assaulting the police officers, the officers may testify to what happened. The defendant may contend that he did not do what he is alleged to have done or that what he did was justified on the ground of self-defense, that is, that the police conduct was itself assaultive and that a reasonable person would have done the same as he did under the same circumstances.

REVERSED AND REMANDED FOR TRIAL.

WAHL and POPOVICH, JJ., dissent.

WAHL, Justice (dissenting).

I must respectfully dissent from the holding of the majority opinion that the evidence of the defendant's resistance to the officers' unconstitutional use of force in seizing him is not the "fruit of the poisonous tree" and therefore need not be suppressed. *See generally Wong Sun v. United States,* 371 U.S. 471, 491, 83 S.Ct. 407, 419, 9 L.Ed.2d 441 (1963). Exploitation of illegal police conduct has become the benchmark test of what evidence will or will not be excluded following a Fourth Amendment violation. *Wong Sun,* 371 U.S. at 488, 83 S.Ct. at 417. The majority concludes, without analysis, that this case involves no exploitation of the unconstitutional use of force to obtain evidence.[1] Such a conclusion defies not only constitutional principles but flies in the face of common sense.

The memorandum of the trial court who heard evidence makes clear that the defendant's violent acts came, if at all, as a direct response to the unconstitutional violence of the police. Such a response is a realistic possibility whenever the police use excessive force. Violence begets violence. When resistance to an unconstitutional use of force is not only direct but predictable that resistance can only be considered a directly caused product of the excessive force.[2]

Defendant's attack on the officers, directly related to the unconstitutional seizure, is in what Professor LaFave calls the simplest category of exclusionary rule cases where "the challenged evidence is quite clearly 'direct' or 'primary' in its relationship" to the unconstitutional conduct. 4 W. LaFave, *Search and Seizure,* § 11.4 at 369 (2d ed. 1987). Evidence of this type, according to LaFave, ought to be suppressed. *Id.*

The majority perceives a clear "per se" rule against suppression in our previous decisions, stating "[t]his court has rejected the contention that evidence of a defendant's resistance to an illegal arrest must be suppressed as forbidden fruit of a Fourth Amendment violation by the police." While this statement may be an accurate summary of our past cases, it does not free us of the responsibility to analyze this case on its own merits. The United States Supreme Court, in a somewhat different fact situation, has rejected the use of per se tests to determine if evidence was obtained by exploitation of an underlying constitutional violation. *See Brown v. Illinois,* 422 U.S. 590, 603, 95 S.Ct. 2254, 2261, 45 L.Ed. 2d 416 (1975). It follows from *Brown* that our previous decisions may be used as a guide in this case but not as the source of a per se rule.

1. The concern of the majority that a future case might involve more complex facts, while a matter for concern, is irrelevant in the relatively simple case before us.

2. The majority's assertion that causation is not the determinative factor when deciding if evidence should be suppressed, while technically correct, somewhat misses the point. The more direct the causal link between the police misconduct and the relevant evidence is the more predictable it becomes that such misconduct will lead to the discovery of such evidence. The more predictable it is that such evidence will be produced, the more likely it is that the police will exploit such misconduct to obtain the desired evidence.

The provocativeness of the police misconduct in the case before us distinguishes it from those cases cited by the majority to support its "per se" rule. Not one of those cases involved the unconstitutional use of violence by the police. *See State v. Kittleson*, 305 N.W.2d 787, 789 (Minn.1981) (after giving notice of desire to speak with defendant police entered room without warrant); *State v. Bale*, 267 N.W.2d 730, 732 (Minn.1978) (initial warrantless arrest for misdemeanor traffic offense assumed illegal); *State v. Combs*, 394 N.W.2d 567, 569 (Minn.App.1986) (automobile stop made without particularized, objective basis) (rev'd. but suppression ruling approved by *State v. Combs*, 398 N.W.2d 563, 565 n. 2 (Minn.1987); *Commonwealth v. Saia*, 372 Mass. 53, 360 N.E.2d 329, 330, 332 (1977) (warrantless entry after notice assumed illegal). None of the underlying unconstitutional acts in these cases could be predicted to result in violence.

Contrary to the majority's assertion, Professor LaFave acknowledges that suppression of a suspect's violent resistance may be required when it is the direct result of the police misconduct. LaFave, *supra*, § 11.4(j), at 461; *see also* § 5.1(d), at 413. "It is possible, * * * that the nature of a particular Fourth Amendment violation will be such that *defensive action by the victim [suspect] can fairly be characterized as exploitation.*" LaFave, *supra*, § 11.4(j), at 461 (emphasis added). The New York Court of Appeals reached a similar conclusion in the case of *People v. Cantor*, 36 N.Y.2d 106, 114, 365 N.Y.S.2d 509, 517, 324 N.E.2d 872, 878 (1975). The defendant in *Cantor* was charged with reckless endangerment as well as with unlawful possession of a weapon. The *Cantor* court suppressed the evidence obtained by the unconstitutional seizure.

It seems a proposition almost too simple to need stating, that where certain types of unconstitutional police misconduct are easily executed and reasonably likely to produce new evidence, that type of misconduct may be exploited and therefore the evidence such exploitation produces must be excluded in order to deter such misconduct. *See* LaFave, *supra*, § 11.4(j), at 459–460. In the case before us, Berg's defensive response to the bloody beating of his head, while pinned beneath the bed, by the police officers was evidence obtained by exploitation because the officers knew their excessive use of force would elicit just such a response. Our constitution was designed to limit the excesses of government power, not to aid in making our citizens victims of that excess. We would be well advised to reconsider the lessons articulated in *Elkins v. United States*, 364 U.S. 206, 222–223, 80 S.Ct. 1437, 1446–47, 4 L.Ed.2d 1669 (1960):

But there is another consideration—the imperative of judicial integrity. It was of this that Mr. Justice Holmes and Mr. Justice Brandeis so eloquently spoke in *Olmstead v. United States*, 277 U.S. 438, at pages 469, 471, 48 S.Ct. 564, at pages 569, 570, 72 L.Ed. 944, more than 30 years ago. "For those who agree with me," said Mr. Justice Holmes, "no distinction can be taken between the government as prosecutor and the government as judge." * * * * "In a government of laws," said Mr. Justice Brandeis, "existence of the government will be imperilled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face." [Citations omitted].

I would affirm the decision of the court of appeals and the decision of the trial court.

POPOVICH, Justice (dissenting).

I join in the dissent of Justice Wahl.