**STATE of Minnesota, Respondent,**

v.

**William Bradley INGRAM, Appellant.**

No. C4–96–2493.

Court of Appeals of Minnesota.

Nov. 4, 1997.

Review Denied Dec. 22, 1997.

John M. Stuart, Minnesota State Public Defender, Niall A. MacLeod, Special Assistant Public Defender, Dorsey & Whitney, L.L.P., Minneapolis, for appellant.

Michael O. Freeman, Hennepin County Attorney, Jean E. Burdorf, Assistant County Attorney, Minneapolis, and Hubert H. Humphrey III, Attorney General, St. Paul, for respondent.

Considered and decided by HARTEN, P.J., and LANSING and RANDALL, JJ.

## OPINION

RANDALL, Judge.

Appellant challenges his conviction for being a felon in possession of a firearm, arguing that the pistol seized must be suppressed because it was the fruit of an illegal search and seizure. We affirm.

## FACTS

On February 9, 1996, at approximately 5:15 p.m., Minneapolis Police Officers Matthew Segulia and David Gray were on patrol when they were flagged down by a citizen at the intersection of Nicollet and Seventh Street. The citizen told the officers that a man in a dark "Hoyas" jacket and a white kerchief on his head was in the bus shelter around the corner, trying to sell marijuana to other people in the shelter.

The officers went to the bus shelter and observed an individual, later identified as Aubrey Keesling (not appellant), matching the description given by the citizen. As they approached the shelter, the officers noticed appellant William Bradley Ingram standing approximately 8–12 inches from Keesling, talking with him. When the officers entered the bus shelter, Officer Segulia immediately told Keesling to put his hands up against the wall. Officer Segulia proceeded to pat search Keesling. At the same time, Ingram exited the bus shelter and walked toward the intersection. Officer Gray followed Ingram and asked him to return to the shelter so they could ask him some questions. Ingram complied with Officer Gray's request.

Once back in the shelter, Officer Gray told Ingram to put his hands up on the shelter wall so he could conduct a pat search. As Ingram raised his arms, he suddenly shifted his weight and darted out of the shelter. In the process, Ingram pushed Officer Gray out of the way. Officer Gray ordered Ingram to stop and shouted that he was under arrest. Officer Gray attempted to stop Ingram by jumping on him, but missed and fell to the ground. Officer Segulia then pursued, tackled, and arrested Ingram. It was then that Ingram told the officers that he was in possession of a pistol. The officers recovered a .380 caliber pistol from Ingram.

According to the officers, up until the moment appellant fled the bus shelter, he appeared calm, did not appear upset, and was cooperative. They also stated that at no time did they see Ingram drop, abandon, or attempt to conceal anything. Officer Gray further admitted that he had no indication that Ingram was in possession of a weapon.

Ingram was charged in Hennepin County District Court with being a felon in possession of a pistol in violation of Minn.Stat. § 624.713, subds. 1(b), 2 (1996). Ingram moved to suppress the pistol at the *Rasmussen* hearing, arguing that he had been illegally seized and that the pistol was the fruit of an illegal seizure. The district court agreed that Ingram had been illegally seized, but refused to suppress the pistol. The court held that the officers failed to articulate sufficient individual suspicion of criminal activity on the part of Ingram. But, in refusing to suppress the pistol, the court ruled that Ingram's knocking down of Officer Gray, and the attempt to flee, constituted new and intervening facts, giving the officers a sufficient basis to arrest Ingram. Consequently, the court held that the pistol was seized as part of a search incident to a lawful arrest.

On July 29, 1996, after stipulating to the state's case based on the testimony from the *Rasmussen* hearing and waiving a jury trial, Ingram was convicted. The district court sentenced Ingram to three years probation.

## ISSUE

Did the district court err in refusing to suppress the pistol as the fruit of the poisonous tree?

## ANALYSIS

Ingram argues that, under the fruit of the poisonous tree doctrine, the district court should have suppressed the pistol found in his possession because it was the result of an illegal seizure. Ingram contends further that despite his attempted flight from the police, the pistol should have been suppressed because it was discovered through exploitation of the illegal police conduct and not by means sufficiently distinguishable from the illegal actions of the police.

 To begin, we reject Ingram's argument that the state cannot appeal the district court's ruling that the officers lacked a reasonable articulable suspicion to stop him because the time to appeal that issue had passed. The state did not make a partial appeal of the trial court's suppression ruling because the state prevailed at the suppres-

sion hearing. The pistol was admitted into evidence. Therefore, the state had no right of pretrial appeal under Minn. R.Crim. 28.04. Put another way, if the state offers a piece of evidence supported by three different theories and the district court rules against it on theory one and two, but declares the evidence admissible for trial on the last issue, the state cannot take a pretrial appeal as a matter of right and argue that it should be vindicated on the two issues on which it lost. But when a defendant appeals a conviction, and raises suppression issues, as here, the state, as part of being the respondent on appeal, is entitled to argue that they should have prevailed at the suppression hearing on even more issues than they did. Thus, we conclude that the state may properly challenge the district court's ruling on the issue of articulable suspicion. But on the issue of articulable suspicion, as did the trial court, we find for Ingram.

■ Turning our attention to the issue of Ingram's search and seizure, the district court properly ruled that there was an impermissible search and seizure of Ingram because the officers failed to articulate a reasonable suspicion that Ingram was engaged in criminal activity.

> For purposes of Article I, Section 10 of the Minnesota Constitution, which prohibits unreasonable searches and seizures, a person has been seized if in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he or she was neither free to disregard the police questions nor free to terminate the encounter.

*State v. Cripps,* 533 N.W.2d 388, 391 (Minn. 1995).

■ Here, Ingram was seized the moment Officer Gray told him that he was going to pat him down and search for weapons and narcotics. Under the circumstances, no reasonable person would believe that they were free to leave or end the encounter.

■ "A police officer may stop and temporarily seize a person to investigate that person for criminal wrongdoing if the officer reasonably suspects that person of criminal activity." *Id.* The officer must be able to

articulate "a 'particularized and objective basis for suspecting the [individual seized] of criminal activity.'" *Berge v. Commissioner of Pub. Safety,* 374 N.W.2d 730, 732 (Minn. 1985) (emphasis omitted) (quoting *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981)). The officer's determination is made "in light of his or her experience that criminal activity may be afoot." *In re Welfare of G.M.,* 560 N.W.2d 687, 691 (Minn.1997). A police officer may also conduct a pat search for weapons if he has a reasonable, articulable suspicion that a suspect might be engaged in criminal activity, and the officer reasonably believes that the suspect might be armed and dangerous. *State v. Dickerson,* 481 N.W.2d 840, 843 (Minn.1992), *aff'd,* 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993).

Here, Officer Segulia testified that Ingram was stopped because, as the officers entered the shelter and told Keesling to put his hands up, Ingram walked immediately away. Officer Segulia claimed that this action caused him to believe that Ingram might have narcotics on his person or that he had just purchased some from Keesling. Officer Segulia testified that based on his experience, Ingram's behavior "is consistent with individuals dealing in narcotics." Officer Gray stated that Ingram was stopped because he was observed standing within a foot of Keesling, talking in what appeared to be a "quiet voice," and because Ingram walked quickly to the nearby intersection when the officers approached. This, according to Officer Gray, "was enough reasonable suspicion to, at least, talk with the party" because, in his experience, individuals engaged in narcotics transactions tend to display "highly evasive maneuvers" and tend to speak in "quiet voices." The district court concluded this was insufficient and ruled that the officers had failed to articulate a particular and objective basis to justify the stop of Ingram. We agree with the district court.

An analogous situation was addressed by the United States Supreme Court in *Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), a companion case to *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In *Sibron,* a police offi-

cer approached and searched the defendant based solely on the fact that he had observed the defendant speaking with known drug addicts. *Sibron,* 392 U.S. at 45, 88 S.Ct. at 1893. The supreme court rejected the notion that the search and seizure of defendant was a protective search under *Terry,* holding that

> [t]he inference that persons who talk to narcotics addicts are engaged in the criminal traffic in narcotics is simply not the sort of reasonable inference required to support an intrusion by the police upon an individual's personal security.

*Id.* at 62–63, 88 S.Ct. at 1902–03.

The supreme court reached a similar result in *Ybarra v. Illinois,* 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979). In that case, the police served a search warrant on a tavern in which the bartender was suspected of selling heroin. *Id.* at 88, 100 S.Ct. at 340–41. After conducting a protective pat down search of the tavern patrons for weapons, the police removed a cigarette pack containing six packets of heroin from defendant. *Id.* at 89, 100 S.Ct. at 341. The Supreme Court reversed the defendant's conviction, holding that, "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Id.* at 91, 100 S.Ct. at 342. The court rejected the state's argument that the search was justified under *Terry,* stating that it could not take the first step required under *Terry* because there was no evidence to support a reasonable belief that the defendant was armed and dangerous. *Id.* at 92–93, 100 S.Ct. at 343. The court noted that the officers did not recognize the defendant as a person with a criminal history nor did they have any particular reason to believe he was a danger because his hands were empty, he gave no indication of possessing a weapon, he made no gestures or other actions indicating he intended to commit an assault, and he acted in a manner that was not threatening. *Id.* at 93, 100 S.Ct. at 343.

In *State v. Eggersgluess,* 483 N.W.2d 94, 96 (Minn.App.1992), decided by this court, a police officer stopped to assist a motor vehicle legally parked on the side of the road. Defendant was a passenger in the back seat. *Id.* The officer noticed a mug of beer in the front seat and asked the four passengers, including defendant, to hand over all their alcohol to him. *Id.* Defendant handed the officer an unopened can of beer. The officer asked the occupants to exit the vehicle and he conducted a pat search of each occupant for weapons and open bottles because he believed that " 'there is always a possibility of [a weapon] being there.' " *Id.* During the frisk of defendant, the officer found a bag of marijuana. *Id.*

This court held that the officer lacked probable cause to search for an open bottle or weapons because he had no independent, articulable facts indicating that defendant was engaged in criminal activity or that he was armed and dangerous. *Id.* at 97. The court held that the

> [c]onduct of third parties cannot provide probable cause to search a person unless the person's actions afford independent suspicion that he too was engaged in the prohibited conduct.

*Id.*

The decisions in *Sibron, Ybarra,* and *Eggersgluess* establish that merely speaking with and being in close proximity with others suspected of criminal activity, without more, may be insufficient to satisfy not only the probable cause requirement for search and seizures, but also insufficient to reach the threshold of reasonable articulable suspicion required to conduct a protective pat search under *Terry.*

When two young minority males, talking at a public bus stop in Minneapolis, are observed lowering their voices when police officers approach, about the same earth-shattering inferences can be drawn as when two sixth graders, whispering to each other in side-by-side desks, lower their voices when they see the school teacher turn and look at them. Put another way, lowering your voice is not a cataclysmic event. In any public place, the approaching of police officers could lead any two people of either gender or any race to lower their voices. Although lowering one's voice at the approach of police officers is not totally inconsistent with the possibility that crime is being discussed,

more importantly, lowering one's voice is totally consistent with an infinite number of proper behaviors.

The state counters by arguing that Officer Gray's attempted pat search of Ingram was justified under the circumstances because the officers were investigating a crime in which the offender is typically armed and dangerous, drug dealing. It has been recognized that the right to frisk for weapons is automatic whenever the suspect has been stopped for a type of crime for which the offender would normally be armed, such as "'robbery, burglary, rape, assault with weapons, homicide, and dealing in large quantities of narcotics.'" *State v. Payne*, 406 N.W.2d 511, 513 (Minn.1987) (quoting 3 Wayne R. LaFave, Search and Seizure § 9.04(a), at 506 (1987)). But here, there is no evidence of any of those crimes. At most, you could imply a bare suspicion that illegal conduct was being discussed, and as stated earlier, all forms of legal conduct could have been discussed also.

Here, the officers testified that until he darted from the bus shelter, Ingram appeared calm and was cooperative. They also stated that at no time did they observe Ingram drop, abandon, or attempt to conceal anything. Officer Gray admitted that he had no indication that Ingram was in possession of a weapon. Based on these facts, the officers did not have a reasonable basis to conclude Ingram might be armed and dangerous. Thus, the officers had no right to frisk Ingram.

The question remains whether Ingram's actions in darting from the bus shelter constituted new and intervening facts sufficient to justify the officer's pursuit, apprehension, and arrest of Ingram. We conclude that they were.

Generally, evidence of a crime committed in response to an illegal police arrest or search is not suppressed as the fruit of the prior illegality. *State v. Balduc*, 514 N.W.2d 607, 611 (Minn.App.1994). On appeal, this court asks

> "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at

by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

*State v. Doughty*, 472 N.W.2d 299, 305 (Minn. 1991) (quoting *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 417–18, 9 L.Ed.2d 441 (1963)).

Minnesota courts have generally held that resisting arrest and flight from a police officer, even if prompted by illegal police conduct, are intervening circumstances sufficient to purge the illegality of its primary taint. *See City of St. Louis Park v. Berg*, 433 N.W.2d 87, 90 (Minn.1988) (holding that evidence of defendant's resistance to arrest may not be excluded as fruit of the poisonous tree); *State v. Combs*, 394 N.W.2d 567, 568–69 (Minn.App.1986) (holding an illegal arrest does not require suppression of evidence of a crime committed in response to the arrest), *rev'd in part on other grounds, State v. Combs*, 398 N.W.2d 563 (Minn.1987). This is in contrast to situations where the defendant is merely trying to dispose of illicit contraband. *See Balduc*, 514 N.W.2d at 611 (holding that attempt to dispose of incriminating evidence is predictable and common response to illegal search and proper application of exclusionary rule requires evidence to be suppressed). Minnesota law, however, "does not recognize defendant's asserted right to resist an unlawful arrest or search." *State v. Wick*, 331 N.W.2d 769, 771 (Minn.1983); *see State v. Hoagland*, 270 N.W.2d 778, 780 (Minn.1978) (stating same).

Thus, Ingram was not permitted to brush Officer Gray out of the way and flee. A defendant may not resort to self-help to resolve disputes concerning unreasonable searches and seizures, because the legal safeguards under the Fourth, Fifth, Sixth, and Fourteenth Amendments provide "'the victim of an unlawful search with realistic and orderly legal alternatives to physical resistance.'" *Hoagland*, 270 N.W.2d at 780–81 (quoting *United States v. Ferrone*, 438 F.2d 381, 390 (3rd Cir.1971)). The district court went so far as to note that *if* Ingram had complied with Officer Gray's request to be pat searched, it likely would have suppressed the pistol.

It is immaterial whether Ingram was charged with assault of a police officer, resisting arrest, or obstructing legal process. Ingram concedes that he was fleeing the police after a pat down search had been started and that the police had a right to apprehend him. We need not decide what would have happened had Ingram been chased after his flight and then searched fully without his acquiescence, the search revealing contraband secreted, for instance, in his shoes. That is not the issue before us. Ingram, for whatever personal reasons, told the arresting officer that he was carrying a pistol. This gave the officer the right to take the pistol and investigate further whether Ingram was in lawful possession of that pistol.

Further, we cannot say as a matter of law that the pistol was recovered by exploitation of police illegality. The crime Ingram committed, being a felon in possession of a pistol, was unrelated to the offense the officers were investigating, drug trafficking. Ingram's seizure and attempted search were not manufactured in an attempt to discover the pistol. The pistol was obtained only after Ingram fled a pat down search that had already been started. This was an act of free will on Ingram's part that is sufficient to purge the taint of his initial stop and attempted pat down.

## DECISION

Despite the illegality of the initial police search and seizure, Ingram's flight from the police was an act of free will sufficient to purge the police illegality of its primary taint. That flight justified the officers in pursuing, apprehending, and arresting him. A defendant does not have the right to resist an unlawful search and seizure. The legal safeguards under the Fourth, Fifth, Sixth, and Fourteenth Amendments provide "the victim of an unlawful search with realistic and orderly legal alternatives to physical resistance." Ingram's physical resistance, flight, and subsequent arrest were intervening facts sufficient to support the taking of Ingram's pistol, particularly when he volunteered to the officer that he was carrying a weapon. The district court did not err in allowing the pistol to be admitted into evidence.

**Affirmed.**