# STATE OF MINNESOTA
# IN COURT OF APPEALS
# A24-0271

State of Minnesota,
Respondent,

vs.

Nicholas Norton Engel,
Appellant.

**Filed March 3, 2025**
**Affirmed**
**Schmidt, Judge**
**Concurring in part, dissenting in part, Frisch, Chief Judge**

Pennington County District Court
File No. 57-CR-21-729

Keith Ellison, Attorney General, Jacob Campion, Thomas R. Ragatz, Assistant Attorneys General, St. Paul, Minnesota; and

Nathan Haase, Pennington County Attorney, Kristin Hanson, Assistant County Attorney, Thief River Falls, Minnesota (for respondent)

Claire Nicole Glenn, Climate Defense Project, Minneapolis, Minnesota (for appellant)

Considered and decided by Schmidt, Presiding Judge; Frisch, Chief Judge; and Smith, Tracy M., Judge.

## SYLLABUS

A law-enforcement officer's uncertainty about the validity of a displayed temporary vehicle registration tag due to the inability to read the tag does not on its own amount to reasonable, articulable suspicion of criminal activity sufficient to justify an investigatory vehicle stop.

## OPINION

**SCHMIDT**, Judge

In this direct appeal from a conviction of felony fleeing a peace officer in a motor vehicle, appellant Nicholas Norton Engel argues that his conviction should be reversed because (1) evidence of his flight should have been suppressed because the police officer lacked reasonable, articulable suspicion to stop his vehicle; (2) the evidence was insufficient to prove that he had the specific intent to flee from the police; (3) the district court violated his right to present a complete defense by excluding testimony from his therapist; (4) the district court abused its discretion by denying his motion to dismiss due to respondent State of Minnesota's discovery violations; and (5) the district court violated his due-process rights by denying his motion for a new trial and request for an evidentiary hearing. We hold that the police officer lacked reasonable, articulable suspicion to stop Engel's vehicle, but we conclude that the evidence of Engel's subsequent conduct in fleeing a peace officer in a motor vehicle was admissible. And because Engel's remaining claims do not warrant reversal, we affirm.

## FACTS

At the time of the charged offense, Engel lived at the Red Lake Treaty Camp—with the permission of the Red Lake Nation—to monitor the construction of the Enbridge Line 3 Pipeline. At midnight, Engel left the Treaty Camp in his van to pick up K.O. from the hospital. Engel's van did not have a rear license plate but had a valid Wisconsin-issued temporary registration tag affixed to the lower-left corner of the rear window. After leaving the hospital, Engel and K.O. stopped to buy drinks at a gas station.

A Thief River Falls Police Officer arrived at the gas station shortly thereafter. He observed K.O. standing outside and asked if she was okay. K.O. responded: "Yes I'm fine. I'm just waiting." Engel completed his transaction and left the gas station with K.O.

The officer returned to his squad car to check the status of the vehicle registration while following Engel's van. The officer followed Engel for approximately three miles and noticed that the van did not have a rear license plate. The officer saw paper posted to the lower-left corner of the van's rear window, but could not read the paper in order to determine whether it was a temporary registration tag. As Engel approached a roundabout, the officer turned on his squad's emergency lights to initiate a traffic stop.

In response to the emergency lights, Engel turned on his left-turn signal and merged into the turn lane toward a parking lot. As the officer followed, Engel turned off his left-turn signal, activated his right-turn signal, and merged back into the travel lane. Engel slowed down and turned on his hazard lights but kept driving towards the Treaty Camp. The officer followed Engel with his emergency lights on and briefly turned on the squad car's siren. The officer reported to the dispatcher that Engel was not stopping.

The officer sped up and pulled next to the van. The officer shouted, "Pull over!" Engel responded, "I'm going to." The officer slowed down, moved behind the van, continued to follow the van, but Engel did not stop.

The officer turned on the squad car's siren, pulled alongside the van a second time, and again yelled for Engel to pull over. Engel responded that he was going to pull over. The officer shouted, "No, right now!" The officer again moved behind the van and continued to follow Engel. Engel continued driving forward without pulling over.

3

The police officer then accelerated ahead of Engel's van, made a U-turn to face the van, and exited the squad car. Engel slowed the van significantly. As Engel approached, the officer ordered Engel to stop driving. As the van rolled past the officer, Engel pointed ahead and said that he would pull over down the road. The officer repeated his order to stop the vehicle, but Engel accelerated ahead. The police officer returned to his squad car, made another U-turn, and continued following Engel.

As Engel approached the Treaty Camp, he turned on his left-turn signal, pulled onto the left shoulder, and turned left onto grass and into a ditch outside the Treaty Camp. The police officer continued to follow. Engel made a second left turn and drove parallel to a fence alongside the Treaty Camp, swerved around an additional squad car that had arrived to assist, and finally stopped the van after being surrounded by several law-enforcement vehicles that had also arrived to assist. According to the officer, by the time Engel finally stopped, he had traveled four to five miles since the officer activated his emergency lights.

The state charged Engel with felony fleeing a peace officer in a motor vehicle in violation of Minn. Stat. § 609.487, subd. 3 (2020). Engel was initially represented by an assistant public defender. Less than two months later, a private attorney filed a certificate of representation on behalf of Engel and the public defender withdrew. Engel's new attorney moved to suppress evidence, dismiss the charges against him, and compel discovery. Following briefing and an omnibus hearing, the district court denied the motions. After a pretrial hearing, the district court issued an order that, among other things, excluded the testimony of Engel's therapist, whom Engel intended to call as an expert witness to testify about his posttraumatic stress disorder (PTSD) diagnosis.

4

During a three-day jury trial, the state called the officer who pursued the van as its only witness. During direct examination, Engel learned that the prosecutor had met privately with the officer but failed to disclose a summary of the conversation, part of which the state intended to use in its case-in-chief. The district court sustained Engel's objection and prohibited the prosecutor from asking questions related to the undisclosed statements.

In testifying in his own defense, Engel stated he was not trying to elude the officer and that he continued driving because he wanted to get to the Treaty Camp where there would be witnesses to observe his interaction with police. The jury found Engel guilty.

Engel moved for a new trial after learning that the assistant public defender who briefly represented him in this matter had joined the Pennington County Attorney's Office before his trial. The prosecutor who handled the case from charging through trial made affirmative representations in emails to Engel's counsel that the prosecutor had "no contact" with Engel's former attorney regarding the fleeing matter. At a hearing on the motion, the prosecutor represented to the district court that she did not talk to the attorney regarding the prosecution of Engel. Engel requested an evidentiary hearing on his new-trial motion. The district court directed Engel to submit for in camera review all notes taken by his prior attorney. Engel refused to produce privileged and confidential records. The district court then denied Engel's request for an evidentiary hearing and denied his motion for a new trial. The district court entered a judgment of conviction for fleeing a peace officer in a motor vehicle, stayed imposition of the sentence, and placed Engel on unsupervised probation for two years.

Engel appeals.

**ISSUES**

I.      Did police have reasonable, articulable suspicion justifying Engel's seizure, and if not, was evidence of his subsequent flight subject to suppression?

II.     Did the state present sufficient evidence to prove that Engel had the specific intent to flee a peace officer in a motor vehicle?

III.    Did the district court abuse its discretion by excluding testimony from Engel's therapist?

IV.    Did the district court abuse its discretion by declining to dismiss the case as a sanction for the state's violation of its discovery obligations?

V.     Did the district court abuse its discretion by denying Engel's motion for new trial or request for an evidentiary hearing related to his prior public defender joining the prosecutor's office?

**ANALYSIS**

**I.     Police did not have reasonable, articulable suspicion to seize Engel, but evidence of his flight from police was admissible under controlling caselaw.**

Engel challenges the district court's order denying his motion to suppress.[1]  We review the court's factual findings for clear error and its legal determinations de novo. *State v. Zielinski*, 10 N.W.3d 1, 13 (Minn. 2024).

Engel argues that the district court erred in determining that the police officer had reasonable, articulable suspicion to initiate a stop to check whether the van had a valid temporary registration tag.  Engel contends the violation of his Fourth Amendment rights required suppression of the evidence of his flight.  We agree that the officer lacked reasonable, articulable suspicion to seize Engel.  But we disagree that evidence of his prolonged, subsequent conduct in fleeing a peace officer should have been suppressed.

---

[1] We confine our review of this issue to the facts presented at the omnibus hearing.

6

**A.      Police lacked reasonable, articulable suspicion to justify Engel's seizure.**

The United States Constitution prohibits unreasonable seizures.  U.S. Const. amend. IV.[2]  The parties agree that the officer seized Engel when he turned on the squad car's emergency lights.  We agree.  *State v. Bergerson*, 659 N.W.2d 791, 795-96 (Minn. App. 2003) (holding seizure occurred when squad car's flashing lights activated to initiate stop).

Engel argues that his Fourth Amendment rights were violated because the officer failed to articulate any reasonable suspicion to justify the seizure.  A police officer may "conduct a brief, investigatory stop of a motor vehicle when the officer has a reasonable, articulable suspicion that criminal activity is afoot."  *State v. Taylor*, 965 N.W.2d 747, 752 (Minn. 2021) (quotations omitted).  "Reasonable suspicion must be particularized and based on specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."  *Id.* (quotations omitted).  An officer's "unparticularized suspicion or hunch of criminal activity" cannot justify a stop.  *State v. Timberlake*, 744 N.W.2d 390, 393 (Minn. 2008) (quotations omitted).

---

[2] We question whether Engel has adequately preserved his argument to this court that he should be provided greater protections under the Minnesota Constitution than those provided under the United States Constitution.  Specific to the seizure and suppression issue, Engel's opening brief has one sentence related to the Minnesota Constitution.  Engel's reply brief has no argument related to the state constitution and his attorney never mentioned the Minnesota Constitution at oral argument.  Engel also offers no analysis of *why* the exclusionary rule under the Minnesota Constitution should afford him greater protections than the federal exclusionary rule, *see Kahn v. Griffin*, 701 N.W.2d 815, 829 (Minn. 2005) (articulating factors for raising an argument under the state constitution), nor provides explanation for *how* the exclusionary rule under the Minnesota Constitution should differ from the federal exclusionary rule.  But because we apply Minnesota precedent related to the suppression issue, and because we reject the arguments that Engel does fully make, we need not decide whether Engel has forfeited the argument.

7

The record shows that Engel was lawfully operating his vehicle with no rear license plate but had a valid Wisconsin temporary registration tag properly affixed to the bottom left corner of the rear window. The police officer testified at the omnibus hearing that, in the three miles he followed the van before activating his emergency lights, he observed no traffic violations or signs of unsafe driving. Instead, the officer observed a sign in the rear window that he suspected was a temporary tag, but he was uncertain. Based on his inability to read the registration tag, the officer turned on his squad car's emergency lights.

The police officer's seizure here was based on a "whim" and "idle curiosity" as to whether the temporary tags were valid, which cannot be the basis for an investigatory stop. *See State v. Anderson*, 683 N.W.2d 818, 823 (Minn. 2004). The officer testified that he was unable to read the tag and articulated only uncertainty about whether the sign was a valid, temporary registration. Without more, the officer failed to offer specific and articulable facts to indicate that criminal activity was afoot. *Timberlake*, 744 N.W.2d at 393.[3] We therefore hold that a law-enforcement officer's uncertainty about the validity of a displayed temporary vehicle registration tag due to the inability to read the tag does not on its own amount to reasonable, articulable suspicion of criminal activity sufficient to justify an investigatory vehicle stop.

---

[3] For example, the officer's inability to read the temporary tag was not based on any failure to properly affix it to the rear window, and nothing obstructed the temporary registration from view. *Cf. State v. White*, 759 N.W.2d 667, 670-71 (Minn. App. 2009) (concluding that illegal covering on a license plate justified traffic stop); *State v. Clark*, 394 N.W.2d 570, 572 (Minn. App. 1986) (concluding that traffic stop was justified when the defendant's license plate was "obliterated by snow" and not visible).

Our holding is consistent with an Eighth Circuit Court of Appeals opinion that squarely addressed the same issue. In *United States v. McLemore*, a police officer initiated a traffic stop based on her inability to read a temporary registration tag taped to the left rear window of a vehicle. 887 F.3d 861, 863-64 (8th Cir. 2018). The government argued that the officer's inability to read the registration card constituted reasonable, articulable suspicion to initiate a stop. *Id.* at 865. The Eighth Circuit disagreed, holding that the officer's inability to read the temporary registration card, without more, did not provide "a particularized and objective basis for suspecting the particular person stopped of breaking the law." *Id.* (quotation omitted). The court expressed concern with a contrary result that would allow a police officer to stop a vehicle with a proper temporary registration tag whenever the officer is unable to read the card from inside their own vehicle. *Id.* at 866.

We find this reasoning persuasive. If an officer's inability to read a valid proof of registration amounts to reasonable, articulable suspicion of criminal activity, a seizure could be justified based on circumstances like darkness, inclement weather, or an officer's visual impairment. We decline to adopt a rule that conditions the protections guaranteed by the Fourth Amendment on such arbitrary and subjective considerations, which could subject individuals to "unfettered governmental intrusion" whenever a temporary registration is affixed to a vehicle. *See Delaware v. Prouse*, 440 U.S. 648, 661, 663 (1979) ("To insist neither upon an appropriate factual basis for suspicion directed at a particular automobile nor upon some other substantial and objective standard or rule to govern the exercise of discretion would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches.") (quotation omitted).

9

Here, the police officer testified at the omnibus hearing that he sought to confirm whether the sign in Engel's window was a temporary registration tag. But the desire to confirm the nature or validity of the sign does not, standing alone, amount to reasonable, articulable suspicion necessary to justify a seizure. Because the officer initiated the traffic stop based solely on his inability to discern whether the sign displayed in the rear window was a temporary registration tag, he lacked the required reasonable, articulable suspicion of criminal activity to conduct a constitutionally permissible seizure.

**B.     Though the seizure was improper, the evidence of Engel's flight was admissible under controlling precedent.**

Having determined that the officer's seizure of Engel violated his Fourth Amendment rights, we next address whether the violation required suppression of the evidence of Engel fleeing the police. The exclusionary rule traditionally bars evidence of "'tangible materials obtained either during or as a direct result of an unlawful'" seizure or search. *State v. McDonald-Richards*, 840 N.W.2d 9, 15 (Minn. 2013) (quoting *Wong Sun v. United States*, 371 U.S. 471, 485 (1963)). The "primary purpose of the exclusionary rule is to deter police misconduct." *State v. Hardy*, 577 N.W.2d 212, 217 (Minn. 1998).

Controlling precedent from the Minnesota Supreme Court and from our court holds that evidence of a defendant committing a new crime in response to unconstitutional police conduct—such as fleeing police, resisting arrest, or assaulting a police officer—constitutes intervening circumstances that purge the subsequent conduct from the taint of the unlawful seizure. *See, e.g.*, *City of St. Louis Park v. Berg*, 433 N.W.2d 87, 89 (Minn. 1988) (rejecting "the contention that evidence of a defendant's resistance to an illegal arrest must be

10

suppressed as forbidden fruit of a Fourth Amendment violation by the police");
*State v. Wick*, 331 N.W.2d 769, 771 (Minn. 1983) ("Minnesota law does not recognize [a] defendant's asserted right to resist an unlawful arrest or search."); *State v. Ingram*, 570 N.W.2d 173, 178-79 (Minn. App. 1997) (noting that "evidence of a crime committed in response to an illegal police arrest or search is not suppressed as the fruit of the prior illegality," and concluding that "[d]espite the illegality of the initial police search and seizure, Ingram's flight from the police was an act of free will sufficient to purge the police illegality of its primary taint"), *rev. denied* (Minn. Dec. 22, 1997).[4] The supreme court has concluded that a defendant may not resort to "self-help" to resolve disputes concerning unreasonable searches and seizures because the legal safeguards under the Fourth, Fifth, Sixth, and Fourteenth Amendments provide "the victim of an unlawful search with realistic and orderly legal alternatives to physical resistance." *State v. Hoagland*, 270 N.W.2d 778, 780-81 (Minn. 1978) (quotations omitted).

In determining whether to apply the exclusionary rule to an intervening act of a defendant's free will that amounts to a new crime being committed, the supreme court has directed courts to focus the inquiry on "whether the state is seeking to exploit the illegality of its agents to gain some advantage." *Berg*, 433 N.W.2d at 90. The state exploits the

---

[4] *See also State v. Kittleson*, 305 N.W.2d 787, 789 (Minn. 1981) (concluding that "the exclusionary rule did not require suppression of the evidence" of defendant's assault on an officer even if the officer illegally entered defendant's home); *State v. Combs*, 394 N.W.2d 567, 569 (Minn. App. 1986) ("It is well settled that even when police conduct an illegal arrest or search, evidence of a crime committed in response is not suppressed as a fruit of the prior illegality."), *rev'd in part on other grounds but on this point approved by State v. Combs*, 398 N.W.2d 563, 565 n.2 (Minn. 1987).

illegality of its agents by, for example, seizing "other evidence relating to the offense for which [the person was] arrested or for some other offense" or "deliberately provoking [the] defendant into committing a new crime of resisting arrest." *Id.*

The state, here, did not seek to exploit the illegal conduct of the police officer in order to gain an advantage by seizing incriminating evidence already in existence. *See id.* The seizure of such evidence is subject to the exclusionary rule—whether related to the offense for which the person was illegally seized[5] or related to some other offense.[6] *Id.*; *see also State v. Leonard*, 943 N.W.2d 149, 162 (Minn. 2020) (excluding evidence found in defendant's hotel room due to illegal search of hotel registry); *State v. Davis*, 910 N.W.2d 50, 56 (Minn. App. 2018) (excluding gun recovered after illegal detention). Evidence that exists at the time of the illegal seizure is generally fruit of the poisonous tree because there have been no intervening acts of the defendant's free will.

The state also did not seek to exploit the illegality of the police officer's unlawful seizure by provoking Engel "into committing a new crime of" fleeing a peace officer in a motor vehicle. *Berg*, 433 N.W.2d at 90. On the contrary, the record demonstrates that Engel had multiple opportunities to stop. The officer turned on the squad car's emergency lights, activated the siren two different times, pulled alongside the van two times and yelled for Engel to stop, and turned the squad car around to face Engel and—after exiting the

---

[5] For example, if Engel's van did not have a valid registration tag, evidence of the crime of driving without valid license plates would be excluded based upon the illegal stop.

[6] For example, if police had recovered narcotics in Engel's car, evidence of the other offense—*i.e.*, possession of a controlled substance—that was unrelated to the offense for which Engel was illegally seized would be excluded due to the illegal stop.

12

squad car—ordered him to stop the van. Despite the officer's numerous attempts to stop Engel, he did not stop. Another officer attempted to get Engel to stop near the Treaty Camp, but Engel also drove around that squad car. Engel did not stop until after several law-enforcement vehicles surrounded the van and prevented him from continuing to drive.

At some point in the continuum of these facts, Engel crossed the line and resorted to self-help and—in an intervening act of his own free will—committed the new crime of fleeing a peace officer in a motor vehicle. Based upon these case-specific facts,[7] and consistent with what the supreme court held in *Berg*, the evidence of Engel's flight "may not be excluded as poisonous fruit of a Fourth Amendment violation." *Id.* at 90.

Engel attempts to distinguish *Berg* by arguing that his flight was a predictable response to the officer's unlawful seizure. The dissent in *Berg* made this same argument. *See id.* at 92-93 (Wahl, J., dissenting). The dissent contended that "[w]hen resistance to an unconstitutional use of force is not only direct but predictable" the defendant's conduct in resisting "can only be considered a directly caused product" of the police officers' use of unconstitutional excessive force. *Id.* at 92 (Wahl, J., dissenting). But the majority of the supreme court rejected this "causation rationale," noting that the analysis is "not a question of whether the defendant's resistance and the police officers' unlawful conduct are inextricably interwoven[.]" *Id.* at 90. *See also State v. Bale*, 267 N.W.2d 730, 732-33

---

[7] In accordance with supreme court precedent, we are not adopting a per se rule that applies to all fleeing charges following an illegal stop. As the court recognized in *Berg*, there may be an instance where the state attempts to exploit a police officer's egregious conduct such that the new crime of fleeing must be suppressed. 433 N.W.2d at 91. But our review of these facts leads us to the conclusion that this is not that case.

(Minn. 1978) (rejecting "but for" causation test in analyzing whether seizure of physical evidence would have occurred following illegal arrest and concluding "[t]he test is 'whether granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint'") (quoting *Wong Sun*, 371 U.S. at 488). Engel's argument to distinguish *Berg* is not persuasive.[8]

Following the supreme court's precedent in *Berg*, Engel's prolonged and repeated flight constituted an intervening circumstance that purged the taint of the illegal seizure. Ruling in Engel's favor would run contrary to other precedent from the Minnesota Supreme Court that holds individuals are not allowed to resort to self-help to resolve a dispute concerning an unlawful search or seizure. *Hoagland*, 270 N.W.2d at 780-81.[9] Whether the binding precedent should be narrowed to require suppression of evidence of flight alone following an unlawful seizure is a question for the supreme court. The function of this court is "limited to identifying errors and then correcting them." *Sefkow v. Sefkow*, 427 N.W.2d 203, 210 (Minn. 1988). Based upon binding precedent, there is no error to correct because the evidence of Engel's flight was appropriately admitted at trial.

---

[8] Engel also relies on our decision in *Bergerson* to argue that evidence of his flight should be suppressed. But *Bergerson* involved the suppression of methamphetamine discovered in a car after the defendant fled on foot following an illegal seizure. 659 N.W.2d at 794. The conduct of fleeing a peace officer was not at issue in that appeal because the state dismissed the fleeing charge before trial, leaving only the charge for controlled-substance crime. *Id. Bergerson*, therefore, offers little guidance for the fleeing issue before us.

[9] Ruling in Engel's favor would run contrary to *Hoagland* as drivers would be encouraged to resort to self-help by disobeying law enforcement's clear directives to pull over if the driver—within their own determination—decides that the officer initiated an illegal stop.

**II.** **The state presented sufficient evidence of Engel's specific intent to flee a peace officer in a motor vehicle.**

Engel next challenges the sufficiency of the evidence related to whether he specifically intended to flee a peace officer. Under the statute, a person is guilty when they use a motor vehicle to "flee[] or attempt[] to flee a peace officer who is acting in the lawful discharge of an official duty, and the perpetrator knows or should reasonably know the same to be a peace officer[.]" Minn. Stat. § 609.487, subd. 3. The legislature defined "flee" as "to increase speed, extinguish motor vehicle headlights or taillights, refuse to stop the vehicle, or use other means with intent to attempt to elude a peace officer following a signal given by any peace officer to the driver of a motor vehicle." *Id.*, subd. 1 (2020). We have interpreted the intent element as requiring proof that the defendant had the specific criminal intent to flee. *State v. Johnson*, 374 N.W.2d 285, 288 (Minn. App. 1985), *rev. denied* (Minn. Nov. 18, 1985). A person's state of mind is generally proved through circumstantial evidence. *Loving v. State*, 891 N.W.2d 638, 643 (Minn. 2017).

We use a two-step test in evaluating the sufficiency of circumstantial evidence. *Id.* In the first step, we identify the circumstances proved by the state, "winnowing down the evidence presented at trial to a subset of facts consistent with the jury's verdict, and disregarding evidence inconsistent with the verdict." *State v. Westrom*, 6 N.W.3d 145, 158 (Minn. 2024). In the second step, "we independently examine the reasonable inferences that can be drawn from the circumstances proved," and determine whether "the reasonable inferences are consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis other than guilt." *Id.* at 158-59 (quotation omitted).

15

For the first step, the circumstances proved in the light most favorable to the verdict related to the specific-intent element of felony fleeing include: (1) the police officer activated his squad car's emergency lights to initiate a stop of Engel's van; (2) Engel noticed the emergency lights as soon as they were turned on; (3) Engel did not stop; (4) the officer briefly activated his siren and then pulled the squad car alongside Engel's van and told Engel to pull over; (5) Engel responded, "I'm going to"; (6) the officer moved behind the van and continued to follow Engel; (7) Engel did not stop; (8) the officer reactivated the siren and sped up to be alongside the van a second time and again told Engel to pull over; (9) Engel responded he would pull over further down the road; (10) the officer yelled, "No, right now!" back to Engel; (11) the officer slowed down and resumed following the van; (12) Engel did not stop; (13) the officer then accelerated to get in front of the van, made a U-turn, exited his squad car, and shouted at Engel to pull over; (14) Engel slowed his van as he passed the officer but again did not stop; (15) Engel then accelerated past the officer; (16) the officer got back in the squad car and continued pursuing Engel; (17) when Engel arrived at the Treaty Camp, he turned his van onto the grass, drove into a ditch, and then continued driving alongside the Treaty Camp fence toward the entrance; (18) a second squad car sped into the ditch and attempted to cut off Engel's van; (19) Engel swerved around the second squad car; and (20) Engel only stopped his van after being surrounded by several additional police squad cars.

Analyzing the second step, the reasonable inferences are consistent with guilt and inconsistent with any rational hypothesis other than guilt. *Id.* at 159. The only reasonable inference is that Engel refused to stop—ignoring the squad car's emergency lights, the

16

sirens, two separate commands to pull over, a third command to stop after the officer turned the squad car around to face the van, and a separate squad car that attempted to stop him—because he had the specific intent to flee a peace officer in a motor vehicle.

Engel offers an alternative hypothesis that he asserts is inconsistent with guilt, arguing that he did not actually intend to elude the police. Instead, Engel contends that he intended to stop driving once he reached the Treaty Camp where there would be witnesses who could observe his interaction with the officer. But this hypothesis does not negate the evidence of Engel's specific intent to continue driving despite multiple commands and attempts by police ordering Engel to stop his vehicle. And Engel cites no caselaw to support his contention that a driver may justifiably disobey multiple police commands to stop their vehicle if they intend to stop at some future location. In fact, the law is the opposite: a person must stop when directed by the police to do so. *See State v. Dahm*, 394 N.W.2d 589, 591 (Minn. App. 1986) (concluding that evidence of specific intent to flee was sufficient when defendant "knew the police wanted him to stop" but "refused to do so because he wanted to get his car home"). We conclude the circumstantial evidence was sufficient to support the jury's verdict that Engel had the specific intent to flee a peace officer in a motor vehicle.

**III. The district court did not abuse its discretion by excluding testimony from Engel's therapist.**

Engel contends that the district court abused its discretion and violated his constitutional right to present a complete defense by excluding testimony from his therapist about his PTSD diagnosis and symptoms. We review a district court's evidentiary rulings, including the admissibility of expert testimony, for an abuse of discretion. *State v. Zumberge*, 888 N.W.2d 688, 694 (Minn. 2017) ("We review a district court's evidentiary rulings for abuse of discretion, even when, as here, the defendant claims that the exclusion of evidence deprived him of his constitutional right to a meaningful opportunity to present a complete defense."). "A district court abuses its discretion when its decision is based on an erroneous view of the law or is against logic and the facts in the record." *State v. Guzman*, 892 N.W.2d 801, 810 (Minn. 2017).

In considering the admissibility of expert testimony, the district court must determine "whether the testimony is helpful because it 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'" *State v. Anderson*, 789 N.W.2d 227, 235 (Minn. 2010) (quoting Minn. R. Evid. 702). "The district court may also exclude expert testimony if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Id.* (citing Minn. R. Evid. 403).

The state moved to exclude testimony from Engel's therapist who intended to testify that the symptoms Engel experienced on the date of the incident were consistent with his PTSD diagnosis and related to his prior trauma responses. Following a pretrial hearing,

the district court granted the state's motion and excluded the testimony. The court reasoned that its probative value was "substantially outweighed by the risk of jury confusion and unfair prejudice because the proposed testimony would likely lead the jury to consider whether [Engel] had diminished capacity, which is not a defense recognized in Minnesota."

Engel argues the district court abused its discretion in excluding the expert testimony because the evidence would have provided context for his behavior. But given the narrow issue before the jury, the probative value of such testimony was minimal. The testimony also carried a significant "risk that the testimony would lead the jury to undertake an impermissible inquiry" into whether Engel's PTSD prevented him from forming the requisite subjective mens rea for felony fleeing. *State v. Bird*, 734 N.W.2d 664, 675 (Minn. 2007); *see also Anderson*, 789 N.W.2d at 237 ("Minnesota does not recognize the doctrine of diminished capacity or diminished responsibility."); *State v. Provost*, 490 N.W.2d 93, 101 (Minn. 1992) (concluding "psychiatric opinion testimony is not admissible on whether, in fact, the defendant had the capacity to form the requisite subjective state of mind" because such testimony "impermissibly introduces diminished capacity into the jury's deliberations"). Thus, the district court acted within its discretion by excluding the expert testimony on the basis that its limited probative value was "substantially outweighed by the risk of jury confusion and unfair prejudice."

Even assuming that the district court's exclusion of the therapist's testimony amounted to an abuse of discretion, we conclude that any "error was harmless beyond a reasonable doubt." *Troxel v. State*, 875 N.W.2d 302, 308 (Minn. 2016). We reach this conclusion for three reasons.

19

First, immediately before Engel testified, the district court read the following stipulation to the jury: "Both sides agree that Mr. Engel suffers from chronic PTSD and that Mr. Engel's chronic PTSD diagnosis pre-dates the incident in this case." Thus, Engel's PTSD diagnosis was presented to the jury as an objective fact.

Second, the district court permitted Engel to testify extensively about his mental-health history, including his PTSD diagnosis and how PTSD affects him. Thus, the jury heard the evidence of Engel's PTSD from Engel himself.

Third, additional testimony related to Engel's PTSD would have been cumulative and would not have affected the jury's determination of whether Engel had the specific intent required to establish felony fleeing.

Because there is no reasonable possibility that the verdict might have been different had the expert testimony been admitted, we conclude that the district court's exclusion of evidence, even if improper, was harmless beyond a reasonable doubt.

## IV. The district court did not abuse its discretion by declining to dismiss the case as a discovery sanction.

Engel argues that the state's discovery violations warrant reversal of his conviction. But imposing sanctions for discovery violations "is a matter particularly suited to the judgment and discretion of the trial court" and such decisions will not be overturned absent a clear abuse of discretion. *State v. Lindsey*, 284 N.W.2d 368, 373 (Minn. 1979). In exercising its discretion, the district court must consider "(1) the reason why disclosure was not made; (2) the extent of prejudice to the opposing party; (3) the feasibility of rectifying that prejudice by a continuance; and (4) any other relevant factors." *Id.*

20

"To establish prejudice a defendant must show that a reasonable probability exists that the outcome of the trial would have been different if the disputed evidence had been produced." *State v. Boldman*, 813 N.W.2d 102, 109 (Minn. 2012). A court's determination of whether a prosecutor's discovery violation warrants a new trial "will only be reversed when the discovery violation, viewed in the light of the whole record, appears to be inexcusable and so prejudicial that the defendant's right to a fair trial was denied." *Id.*

Engel's discovery-related argument focuses on the state's failure to disclose statements that the police officer made during a meeting with the prosecutor.[10] During direct examination, the prosecutor asked the police officer if he felt "welcome to go into [the Treaty Camp]." Engel objected. During a bench conference discussion, the prosecutor revealed that she had met privately with the officer the day before trial but had not disclosed any witness statements from that meeting. The substance of the undisclosed statements included that law enforcement was hesitant to enter the Treaty Camp out of concerns for their safety. The state apparently planned to use this testimony to argue that Engel's "ultimate goal was to get behind [the Treaty Camp] fence" and elude the police. The district court sustained the objection and excluded all testimony "in the area that disclosure was not made." Engel then moved to dismiss the case based on the discovery violation. The district court denied Engel's motion because the jury never heard the undisclosed statements and therefore Engel was not prejudiced by the violation.

---

[10] Engel lists four other discovery violations in a footnote, all of which involve the state failing to timely disclose information pursuant to the court's deadline. The state concedes it committed these violations. Engel does not, however, make any argument that he was prejudiced by those four violations.

We conclude that the district court did not abuse its discretion in ruling that Engel failed to establish prejudice. First, the court sustained Engel's objection to the prosecutor's line of questioning. Consequently, the jury never heard any of the undisclosed statements.

Second, disclosure of the officer's statements would not have affected Engel's trial strategy. Engel's theory at trial was that he lacked specific intent to flee the police. Engel did not argue to the district court—and similarly fails to specify on appeal—how he would have altered that strategy had he learned that the officer planned to testify that law enforcement did not feel comfortable entering the Treaty Camp.

Third, had the prosecutor properly and timely disclosed the officer's statement after their conversation, the outcome of the trial would be no different. Again, the principal issue contested at trial was whether Engel specifically intended to flee the police. It is unclear how timely disclosure would have produced a different result, especially given the district court's ruling that excluded all testimony related to the undisclosed statements. Thus, the district court did not abuse its discretion by denying the motion to dismiss due to a lack of prejudice.[11]

---

[11] Engel also failed to establish that, notwithstanding a lack of prejudice, his conviction should be reversed in the interests of justice. Such remedy is reserved for particularly "egregious" cases where, for example, the state "took affirmative steps to interfere with the defendant's ability to gather information from potential witnesses." *State v. Jackson*, 770 N.W.2d 470, 479 (Minn. 2009). The prosecutor's discovery violations in this case are concerning. But collectively, they do not amount to misconduct sufficient to set aside the "general practice" of granting reversal only upon a showing of prejudice. *See id.*

**V.    The district court did not abuse its discretion in denying Engel's motion for a new trial or request for an evidentiary hearing.**

In his final argument, Engel contends that the district court abused its discretion by denying his motion for a new trial because the Pennington County Attorney's Office failed to screen his prior defense counsel from assisting in the prosecution in violation of his constitutional right to due process. Alternatively, Engel argues that the denial of his request for an evidentiary hearing on this issue violated his right to procedural due process. We review both the denial of a motion for a new trial and the denial of an evidentiary hearing in the motion-for-new-trial context for an abuse of discretion. *State v. Green*, 747 N.W.2d 912, 917 (Minn. 2008); *State v. Hole*, 400 N.W.2d 430, 434-35 (Minn. App. 1987) (holding that district court did not abuse its discretion by not permitting oral testimony at hearing on motion for new trial). "But we review de novo whether a defendant has been denied due process of law." *State v. Krause*, 817 N.W.2d 136, 144 (Minn. 2012).

After trial, Engel learned that his prior defense attorney had joined the Pennington County Attorney's Office several months before trial commenced. Engel's trial counsel emailed the prosecutor to inquire whether the county attorney's office had taken steps to ensure that Engel's prior attorney had been appropriately screened off from the case:

> [I]t's now come to my attention that [Engel's prior attorney] joined the Pennington County Attorney's Office sometime prior to Mr. Engel's trial. Mr. Engel is very concerned about his former public defender working with you as you were preparing and litigating this trial. Could you please send me what policies and procedures, if any, are in place at the [county attorney's office] to address such situations? And could you please confirm whether and to what extent [the prior attorney] was included in any conversations related to Mr. Engel, his case, or preparation for or litigation of his trial?

23

The prosecutor responded to Engel's attorney's inquiry by email:

> I have had no contact with [Engel's prior attorney] about his very short representation of Mr. Engel, nor has he had any contact with me about his very short representation of Mr. Engel. I looked it up today and it shows Mr. Engel applied for a public defender on January 19, 2022, and [the prior attorney] had two zoom appearances with him until you took over on March 7, 2022. I have no idea how much contact they had or would have had between those two dates nor did I ask.

Engel's attorney responded by email a few minutes later and asserted that the prosecutor had failed to answer the relevant questions, writing:

> My specific questions are (1) whether and to what extent [the prior attorney] was included in any conversations related to Mr. Engel, his case, or preparation for or litigation of his trial; and (2) what policies and procedures, if any, are in place at the [county attorney's office] to address such situations.

The prosecutor did not respond to that email. At a hearing on the motion for new trial, Engel argued that because the Pennington County Attorney's Office had not directly answered the questions regarding the prior attorney's degree of involvement in the prosecution, the district court should hold an evidentiary hearing to develop the facts in order to conclusively determine whether his right to due process had been violated.

The district court denied Engel's motion for a new trial and request for an evidentiary hearing. In its written order, the district court determined that the record did not establish that Engel's prior attorney had "personally and substantially participated in this case while working as a public defender[,]" or assisted in the prosecution of the case after joining the Pennington County Attorney's Office. For the reasons explained below, we discern no abuse of discretion in the district court's rulings.

24

**A.    The record does not establish that Engel's prior attorney assisted with his prosecution in violation of his constitutional right to due process.**

Engel argues the court should have granted his new-trial motion because his prior attorney's new job at the prosecutor's office violated his due-process rights. We disagree.

Engel argued to the district court that his former counsel joined the Pennington County Attorney's Office during the pendency of prosecuting his case, that the office consists of only four attorneys who share a secretary, and that it is unclear whether the office conducted any screening to ensure that his former counsel did not participate in the prosecution. The district court rejected Engel's motion, determining that Engel's contentions rose "merely to the level of subjective speculation" that was not based upon anything in the record. The court also found the prosecutor's representations that the prior attorney had not assisted in the prosecution to be credible and consistent with the record.

The district court's ruling did not amount to an abuse of discretion. Engel produced no evidence that his former counsel participated in the criminal prosecution against Engel. In addition, the prosecutor made affirmative representations to Engel's counsel and to the court that she had "no contact" with Engel's former attorney about his "short representation of Mr. Engel." The district court found the statements by the prosecutor—"as an officer of the Court"—to be credible. Engel has not established a due-process violation, and the district court acted well within its discretion in denying Engel's new-trial motion.[12]

---

[12] Engel also argues that the failure to screen his prior attorney from participating in his prosecution violated his Sixth Amendment right to counsel. Engel cites *Strickland v. Washington*, in which the Supreme Court held that certain Sixth Amendment violations do not require a showing of prejudice to warrant reversal, including actual or constructive

**B.      The district court's denial of an evidentiary hearing did not violate Engel's right to procedural due process.**

Engel also argues that his right to procedural due process entitled him to an evidentiary hearing to determine whether his prior attorney assisted in the prosecution. "Procedural due process is flexible and calls for such procedural protections as the particular situation demands." *Krause*, 817 N.W.2d at 144 (quotations omitted). Courts conduct a balancing test "for determining the procedural due process protections that are required in a particular context" by considering three factors:

> (1) the individual's private interest that will be affected by the State's action; (2) the risk of the erroneous deprivation of that interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the State's interest, including the function involved and the fiscal and administrative burdens it would face in providing greater procedural safeguards.

*Id.* at 144-45 (quotations omitted).

---

denial of assistance of counsel, instances where the state interfered with counsel's assistance, and instances where "counsel is burdened by an actual conflict of interest." 466 U.S. 668, 692 (1984). But the record does not reflect that Engel was denied actual or constructive effective assistance of counsel, that the state interfered with his counsel's assistance, or that Engel's prior attorney was burdened by a conflict of interest *while representing him. See Cuypers v. State*, 711 N.W.2d 100, 104 (Minn. 2006) (explaining that "[a] Sixth Amendment violation can be demonstrated by showing that an actual conflict of interest adversely affected counsel's performance" by showing "that his counsel actively represented conflicting interests") (quotation omitted). We therefore conclude that the evidence does not support Engel's claim that the Pennington County Attorney's Office violated his constitutional right to counsel. And insofar as Engel argues that the county attorney's office had a conflict of interest that should have disqualified it from prosecuting the case, we conclude that the record is insufficient to establish an actual conflict of interest that could serve as a basis for disqualification. *See* Minn. R. Prof. Conduct 1.7, 1.9, 1.11.

26

The first factor weighs in favor of an evidentiary hearing. Engel's personal liberty and right to a fair trial are "obvious and significant" private interests. *Id.* at 145. The third factor also weighs in favor of an evidentiary hearing because granting a hearing would not have caused the state to incur unreasonable fiscal or administrative burdens. *Id.* at 145-46.

The second factor, however, weighs heavily against an evidentiary hearing because any risk of erroneously depriving Engel's interests is not significant. As noted, the prosecutor informed Engel's trial counsel that she and Engel's prior attorney had "no contact" with each other regarding the prior attorney's brief representation of Engel. The prosecutor reiterated at the hearing that the prior attorney "did not assist [her] in the prosecution of this case," that she "prepared and tried this case [herself]," and that the prior attorney was not otherwise "involved" in the prosecution. The prosecutor also represented that although the Pennington County Attorney's Office does not have a written screening policy, the office manager "screens the cases for conflicts."

We discern no error in the district court's decision to credit the prosecutor's representations as an officer of the court that Engel's prior attorney did not assist or participate, actively or otherwise, in Engel's prosecution. As such, the risk of an erroneous deprivation of Engel's private interests under these circumstances is minimal and, therefore, we conclude that the district court did not abuse its discretion in denying Engel's request for an evidentiary hearing.

**DECISION**

We hold that the police officer's uncertainty about the validity of a displayed temporary vehicle registration tag due to his inability to read the tag did not on its own amount to reasonable, articulable suspicion of criminal activity sufficient to justify an investigatory vehicle stop. As such, the police officer violated Engel's constitutional right to be free from an unreasonable seizure by attempting to initiate a stop based solely on his inability to determine whether the sign affixed to Engel's van was a temporary registration tag. But, because evidence of fleeing a peace officer in a motor vehicle in response to an illegal seizure is admissible under Minnesota Supreme Court precedent, we conclude that the district court did not err in denying Engel's motion to suppress the evidence of his flight. Because Engel's remaining challenges do not warrant reversal, we affirm.

**Affirmed.**

**FRISCH**, Chief Judge (concurring in part, dissenting in part)

This matter presents the novel question of whether evidence of flight in a motor vehicle in response to an unconstitutional seizure is subject to suppression under the exclusionary rule. Applying only article I, section 10 of the Minnesota Constitution, I agree that there was no lawful basis for the seizure because the Thief River Falls police officer lacked reasonable, articulable suspicion that appellant Nicholas Norton Engel engaged in criminal activity. But I respectfully disagree that Engel is without a suppression remedy for this constitutional violation and would apply the exclusionary rule to suppress evidence of Engel's flight as fruit of the poisonous tree.

As a threshold matter, application of the Minnesota Constitution obviates the need to reach Engel's Fourth Amendment challenge under the United States Constitution. *See State v. Leonard*, 943 N.W.2d 149, 152 n.1 (Minn. 2020) (declining to reach appellant's Fourth Amendment challenge because appellant's rights were violated under the Minnesota Constitution). Engel effectively preserved a basis for relief under the Minnesota Constitution. Although Engel raised suppression arguments pursuant to both the United States and Minnesota Constitutions, Engel argues on appeal that he is entitled to "more expansive protections" under the Minnesota Constitution, citing *State v. Askerooth*, 681 N.W.2d 353, 363 (Minn. 2004); *State v. Varnado*, 582 N.W.2d 886, 892 (Minn. 1998); and *In re E.D.J.*, 502 N.W.2d 779 (Minn. 1993). Those more expansive protections necessarily include the appropriate remedy to "compel respect for the constitutional guaranty." *State v. Malecha*, 3 N.W.3d 566, 575 (Minn. 2024) (quotation omitted). And in his briefing to this court in support of suppression of evidence of his flight, Engel relies heavily on our

decision in *State v. Bergerson*, 659 N.W.2d 791, 795-97 (Minn. App. 2003), in which we applied article I, section 10 of the Minnesota Constitution to require suppression of evidence obtained as a result of an unlawful seizure. In short, Engel explicitly and repeatedly invokes the distinct protections afforded by the Minnesota Constitution in advancing his suppression argument, thus preserving a basis for relief under the Minnesota Constitution.[1] I therefore consider whether the Minnesota Constitution requires the suppression of evidence.

The Minnesota Constitution protects the right of the people against unreasonable seizures. Minn. Const. art. I, § 10. The Minnesota Supreme Court has made clear that article I, section 10 of the Minnesota Constitution requires reasonable, articulable suspicion of criminal activity to justify a seizure. *E.D.J.*, 502 N.W.2d at 781. I agree with the conclusion of the court that the officer lacked reasonable, articulable suspicion that Engel had engaged in any criminal activity. The officer's seizure therefore violated Engel's rights as secured under our state's constitution.

---

[1] The Minnesota Supreme Court clarified in *City of Golden Valley v. Wiebesick* that the factors set forth in *Kahn v. Griffin*, 701 N.W.2d 815 (Minn. 2005), do "not limit our ability to analyze our constitution independently based on its text, structure, and history." 899 N.W.2d 152, 157 n.3 (Minn. 2017); *see also Leonard*, 943 N.W.2d at 156 n.9 (noting that, in the absence of controlling Fourth Amendment precedent, a litigant need not "articulate a principled basis to interpret Article I, Section 10 more broadly than the Fourth Amendment to receive relief"). And Engel's arguments on appeal under the Minnesota Constitution are more extensive than the state constitutional arguments advanced to this court in *Malecha*, which ultimately resulted in the supreme court's determination that the Minnesota Constitution required suppression of evidence to remedy government misconduct. *See* 3 N.W.3d at 578.

Under the Minnesota Constitution, the exclusionary rule is the normal remedy for the violation of Engel's constitutional rights. *Malecha*, 3 N.W.3d at 571. The supreme court has recognized that the "*central purpose* of Minnesota's exclusionary rule is to deter police misconduct." *Id.* at 577-78, 577 n.4 (emphasis added) (quotation omitted) (recognizing that goals of exclusionary rule include "deterring unlawful government conduct" and "preserving judicial integrity" (emphasis omitted)). And the supreme court has emphasized that the Minnesota Constitution compels application of the exclusionary rule to remedy the acquisition of unlawfully obtained evidence to "compel respect for the constitutional guaranty." *Id.* at 572, 575 (quotation omitted); *cf. State v. Lindquist*, 869 N.W.2d 863, 871 (Minn. 2015) (declining to suppress unlawfully obtained evidence where exclusion "deters no police misconduct and imposes substantial social costs"). To that end, the supreme court has repeatedly enforced the exclusionary rule when application of the rule would deter police misconduct. *See, e.g.*, *Malecha*, 3 N.W.3d at 577-78 (applying exclusionary rule to "deter[] unlawful government conduct" and "promote[] the public perception of fairness in the judicial process" (emphasis omitted)); *State v. Hardy*, 577 N.W.2d 212, 217 (Minn. 1998) (excluding evidence obtained through illegal search "to eliminate the incentive for police officers who have detained a person on a *Terry* stop to overstep the limits of the stop"); *State v. Jackson*, 742 N.W.2d 163, 178-80 (Minn. 2007) (excluding illegally obtained evidence because "the police conduct involved is capable of repetition and . . . application of the exclusionary rule will have an appreciable deterrent effect").

Pursuant to the exclusionary rule, evidence obtained through an unlawful search and seizure, including any "fruits" derived from such unlawful conduct, is generally inadmissible to support a criminal conviction. *State v. Horst*, 880 N.W.2d 24, 36 (Minn. 2016). "Such evidence is considered 'fruit of the poisonous tree.'" *State v. Olson*, 634 N.W.2d 224, 229 (Minn. App. 2001) (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)), *rev. denied* (Minn. Dec. 11, 2001). The state bears the burden to prove that this "evidence was obtained 'by means sufficiently distinguishable to be purged of the primary taint.'" *Id.* (quoting *Wong Sun*, 371 U.S. at 488); *see also State v. Molnau*, 904 N.W.2d 449, 451 (Minn. 2017) ("The State bears the burden of proving that police obtained the challenged evidence in accord with the Constitution.").

We generally weigh four factors to determine whether evidence is fruit of the poisonous tree. *State v. Warndahl*, 436 N.W.2d 770, 776 (Minn. 1989). Those factors are: (1) "the purpose and flagrancy of police misconduct"; (2) the presence of "intervening circumstances"; (3) whether it is likely the police "would have obtained the evidence without the illegal conduct"; and (4) "the temporal proximity" of the illegal conduct and the evidence alleged to be the fruit of the illegality. *Leonard*, 943 N.W.2d at 161. We must balance all these factors and no single factor is dispositive. *Bergerson*, 659 N.W.2d at 797 (citing *State v. Weekes*, 268 N.W.2d 705, 709 (Minn. 1978)).

Regarding the first factor, an illegal traffic stop "is precisely the type of conduct the exclusionary rule is intended to prevent" and thus "weighs in favor of suppression." *See id.* at 797-98. This factor is "especially important, because the aim of the exclusionary rule is to deter police misconduct by removing the incentive to disregard constitutional

guarantees." *State v. Bale*, 267 N.W.2d 730, 733 (Minn. 1978). As to the third factor, the state produced no evidence to establish that evidence of Engel's flight would have been obtained in the absence of the unlawful seizure. The evidence of fleeing materialized immediately after, *and only because of*, the unlawful police conduct. This factor therefore also supports suppression. The fourth factor likewise weighs in favor of suppression because evidence of Engel's flight was obtained immediately after the officer initiated the illegal seizure. *See Olson*, 634 N.W.2d at 229 ("A close temporal proximity favors exclusion.").

Finally, the state has failed to demonstrate that Engel's flight, standing alone, is an intervening circumstance sufficient to purge the taint of the constitutional violation. Generally, a defendant's physical resistance or assaultive conduct in response to unlawful police conduct constitutes "intervening circumstances sufficient to purge the illegality of its primary taint." *State v. Ingram*, 570 N.W.2d 173, 178 (Minn. App. 1997), *rev. denied* (Minn. Dec. 22, 1997). But we have also held that "flight, without physical resistance, d[oes] not present an intervening circumstance sufficient to purge the taint of illegality." *Bergerson*, 659 N.W.2d at 798. Here, there is no allegation that Engel engaged in any form of physical resistance or assaultive conduct. The only alleged intervening circumstance is his flight from the unlawful seizure.

It is true that our supreme court has declined to extend the exclusionary rule to suppress evidence of assaultive conduct on a police officer. *See City of St. Louis Park v. Berg*, 433 N.W.2d 87, 89-90 (Minn. 1988) (concluding that defendant's physical resistance to unlawful arrest was not subject to suppression); *State v. Kittleson*, 305 N.W.2d 787, 789

(Minn. 1981) (concluding that "the exclusionary rule did not require suppression" of evidence of defendant's assault on an officer even if the officer illegally entered defendant's home). But Engel's actions, while concerning, are not equivalent to assaultive conduct that the supreme court has narrowly excepted from the reach of the exclusionary rule. *See State v. Morin*, 736 N.W.2d 691, 698 (Minn. App. 2007) ("Fleeing a police officer, although a physical act, is of a significantly different nature from obstructing or resisting a police officer."), *rev. denied* (Minn. Sept. 18, 2007).

Minnesota has not adopted a per se rule that criminal conduct committed in response to unlawful police conduct is not fruit of the poisonous tree and therefore admissible. To the contrary, the ultimate question associated with application of the exclusionary rule under the Minnesota Constitution is whether suppression of the evidence would effectively deter government misconduct and whether "the social costs of exclusion outweigh its deterrent benefit." *Malecha*, 3 N.W.3d at 574-75. The very existence of the balancing test—most recently applied by the supreme court in *Leonard*—confirms that we must consider on a case-by-case basis whether evidence is fruit of the poisonous tree based on the totality of circumstances. 943 N.W.2d at 161-62; *see also State v. McDonald-Richards*, 840 N.W.2d 9, 15 (Minn. 2013) (explaining that Minnesota has adopted the "fact-specific inquiry" announced in *Brown v. Illinois*, 422 U.S. 590 (1975), to determine whether "the taint of an illegal arrest is sufficiently attenuated" to permit admission of verbal evidence obtained after an unlawful arrest); *State v. Sickels*, 275 N.W.2d 809, 814 (Minn. 1979) (citing *Brown* in setting forth the four-factor fruit-of-the-poisonous-tree test).

In addition, we have recognized that some forms of criminal conduct in response to unlawful police action are subject to suppression when such conduct is nonviolent and is also "a predictable and common response." *See State v. Balduc*, 514 N.W.2d 607, 611-12 (Minn. App. 1994) (suppressing evidence of defendant's efforts to dispose of incriminating evidence that supported obstruction charge because the new criminal conduct "was foreseeable as a consequence of the illegal search, even if it was not the object of the search"). That is the case here. Engel drove at a slow speed on an otherwise deserted rural road; activated his hazard lights and used his turn signal; affirmatively, consistently, and repeatedly communicated his intention to pull over safely; and at all times remained within the officer's sight. Assuming without deciding that this conduct may also be unlawful, the "cost" of excluding evidence of this nature of flight from police "must be balanced against the deterrence of improper police action that the exclusionary rule promotes." *Lindquist*, 869 N.W.2d at 871 (quotations omitted). Because Engel's flight was nonviolent and because an unlawful traffic stop is precisely the type of conduct the exclusionary rule is intended to deter, that balancing militates in favor of suppression.[2]

Engel's flight was also a foreseeable consequence of the officer's unlawful seizure. *See Balduc*, 514 N.W.2d at 611-12. The officer followed Engel for three miles on a dark and deserted rural road and then initiated a traffic stop despite the absence of any violation of law. A police encounter under such circumstances can be frightening for many. *See*

---

[2] Because this is a fact-based inquiry, it bears emphasis that such balancing may yield a different result with dissimilar factual circumstances giving rise to flight from law enforcement.

*Utah v. Strieff*, 579 U.S. 232, 252-54 (2016) (Sotomayor, J., dissenting) (discussing the fear and humiliation experienced by individuals subjected to suspicionless stops). Engel testified that his fear motivated his decision to drive to a more populated location before stopping to interact with law enforcement. And our caselaw has repeatedly addressed circumstances involving the act of fleeing a police officer in response to unlawful police conduct, which underscores that such a response is unsurprising. *See, e.g.*, *Leonard*, 943 N.W.2d at 154, 162 (suppressing evidence obtained following defendant's flight in response to unlawful police conduct); *Bergerson*, 659 N.W.2d at 798-99 (same); *Hardy*, 577 N.W.2d at 217 (excluding evidence forcibly extracted from defendant's mouth after defendant fled "in reaction to the illegal search attempted by the police"). Evidence of Engel's flight arose from an exploitation of unlawful police conduct, thereby justifying application of the exclusionary rule to deter future similar conduct. *See Berg*, 433 N.W.2d at 93 (Wahl, J., dissenting) ("It seems a proposition almost too simple to need stating, that where certain types of unconstitutional police misconduct are easily executed and reasonably likely to produce new evidence, that type of misconduct may be exploited and therefore the evidence such exploitation produces must be excluded in order to deter such misconduct."); *cf.* 6 Wayne R. LaFave, *Search & Seizure* § 11.4(j), at 500 (6th ed. 2020) (explaining that admitting forms of criminal conduct that are "common and predictable consequences" of unlawful police action "would encourage . . . Fourth Amendment violations in future cases"). For all these reasons, I conclude that the state has failed to meet its burden to show that Engel's flight alone presented an intervening circumstance sufficient to purge the taint of unlawful police conduct and that this factor also weighs in

favor of suppression. *See Bergerson*, 659 N.W.2d at 798. Taken together, all four factors support a determination that Engel's flight was fruit of the poisonous tree, thus requiring application of the exclusionary rule. *See Leonard*, 943 N.W.2d at 161-62; *Bergerson*, 659 N.W.2d at 798-99.

In sum, because the state has failed to meet its burden to show that evidence of Engel's flight was admissible and because the benefits of deterring unlawful police conduct outweigh the costs of excluding evidence of Engel's nonviolent flight, suppression is warranted to vindicate the violation of Engel's rights and to compel respect for the constitutional guaranty, as secured under article I, section 10 of the Minnesota Constitution. *See Malecha*, 3 N.W.3d at 572, 575-76 (emphasizing "the importance of the exclusionary rule in Minnesota").

I therefore respectfully dissent from the opinion of the court that evidence of Engel's flight is admissible. I would apply article I, section 10 of the Minnesota Constitution to reverse the decision of the district court denying the motion to suppress evidence of Engel's flight from police and apply the exclusionary rule to suppress that evidence as fruit of the poisonous tree. I would not reach and express no opinion regarding the remaining issues raised on appeal.